**Frank WEILER, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 5851.**

United States District Court
M. D. Pennsylvania.

Oct. 10, 1960.

John B. Schaner, Lewistown, Pa., for plaintiff.

Charles K. Rice, Asst. Atty. Gen., James P. Garland, Chief, Trial Section, Arthur L. Biggins, Myron C. Baum, George Elias, Jr., Tax Division, Dept. of Justice, Washington, D. C., Daniel H. Jenkins, U. S. Atty., William D. Morgan, Asst. U. S. Atty., Scranton, Pa., for defendant.

FOLLMER, District Judge.

In this case plaintiff seeks to recover $5,835.60 with interest, alleged to have been erroneously overpaid as income tax for the calendar year 1950. The case was tried to the Court without a jury.

The Court having considered the pleadings, the evidence adduced at the trial, and the briefs of the parties, and being advised in the premises, now finds the facts herein and states its conclusion as follows:

### Findings of Fact

1. Plaintiff, Frank Weiler, instituted this action against defendant under 28 U.S.C. § 1346(a) (1) and the Internal Revenue Laws.

2. Plaintiff is a citizen of the United States and resides in Armagh Township, Mifflin County, Pennsylvania.

3. Since 1927 plaintiff has been engaged in the egg huckstering or egg wholesaling business operating out of Reedsville, Mifflin County, Pennsylvania.

4. Plaintiff's method of operation was to collect fresh eggs daily from farmers throughout central Pennsylvania. The price paid for the eggs was based upon the market price at 11:40 o'clock a. m. on the preceding day. For eggs collected on Mondays the price thereof was based upon the market price at 11:40 o'clock a. m. on the preceding Fridays. Having collected the eggs, the plaintiff would separate them by color, grade them for size, candle and repack them. He would thereafter haul them to Jersey City, New Jersey, for sale to his then one customer, Gem Dairy Products Company.

5. Not having engaged in the egg storage business, it was plaintiff's general custom on collection to purchase all the eggs available for sale by the farmers and to sell them as soon as possible after processing, which sales usually occurred within two to five days thereafter.

6. From 1927, at which time the plaintiff entered the egg huckstering business, through 1950 the annual price variation in eggs would range from a high in autumn to a low in winter or early spring.

7. The processing interval was lengthened somewhat when it ran into a week end because the market is closed on Saturday and Sunday. If the price fell between 11:40 o'clock a. m. of the day before an egg was bought and the time three to five days later when the egg was sold, plaintiff would sustain a loss.

8. Prior to 1950 plaintiff's loss due to the seasonal fall in the price of eggs amounted to $7,000 to $10,000 per year.

9. As a huckster, plaintiff could not avoid losses from a fall in fresh egg prices. By the inherent nature of the

huckster business, he was committed to the purchase from the farmers on his huckster route of all of the eggs offered by said farmers for sale. Since eggs are perishable, plaintiff could not refuse to buy them for even a day, and having bought them, plaintiff was bound to sell them within a few days.

10. During the seasonal rise in the price of eggs, plaintiff had the risk of scarcity. His inventory varied from 3,000 to 4,000 cases worth $30,000 to $40,000. A single buyer had relied on obtaining plaintiff's inventory for supply since 1932. In times of scarcity plaintiff bought fresh and many times refrigerated eggs from others than the farmers on his route wherever he could get hold of them, in order to maintain his supply to his single buyer. Plaintiff had taken actual delivery of not less than thirty-three carloads of eggs purchased by him in futures transactions in longs. Keeping the business of the single buyer was economically imperative not only to plaintiff but also to the farmers within a radius of 50 miles of plaintiff who relied on plaintiff's buying and selling of their eggs.

11. Plaintiff did not store eggs.

12. No insurance or any other form of protection except hedging transactions was available to protect plaintiff's business against the aforementioned risks of loss and scarcity due to the seasonal variation in production of egg actuals.

13. Plaintiff entered into transactions in the egg futures commodity market, the Chicago Mercantile Exchange, as hedging transactions for the purpose of protecting his business against the uninsurable risks of loss and scarcity due to the seasonal variation in production of egg actuals.

14. The egg futures commodity market is an organized commodity market, to wit, the Chicago Mercantile Exchange.

15. Prices on a commodity futures market follow the prices on the market of actuals of the same commodity. Any spread between the two is kept to a minimum by straddle transactions between futures and spot markets.

16. Since the prices of egg futures follow the prices of egg actuals, plaintiff entered into short sales transactions open during the period of the seasonal risk of loss from falling actuals prices, as hedging transactions for the purpose of protecting plaintiff's business against loss from such falling actuals prices by gains from futures.

17. Since the prices of egg futures follow the prices of egg actuals, plaintiff entered into futures transactions in longs open during the period of the seasonal risk of scarcity, as hedging transactions for the purpose of protecting plaintiff's business against failure of supply for his single buying customer.

18. The basic pattern of plaintiff's futures transactions was consistent throughout the year 1950 with the risk due to the seasonal variation in production of egg actuals, prevailing in plaintiff's actuals business, to wit: long when the prevailing risk was of scarcity, fluctuation between long and short when the prevailing risk was changing, and short when the prevailing risk was of loss from falling actuals prices.

19. Plaintiff's position was long consistently and without exception for the nearly 5 months between March 20, 1950 and August 10, 1950, during the period when the prevailing risk due to said seasonal variation was of scarcity.

20. Plaintiff's position was fluctuating only from March 10, 1950, to March 20, 1950, and from August 10, 1950, to October 3, 1950, during the periods when the prevailing risk due to said seasonal variation was changing.

21. Plaintiff's position was consistently short for the more than 5 months aggregated by the periods from January 1, 1950 to March 10, 1950 and from October 3, 1950 to December 31, 1950, when the prevailing risk due to the aforementioned seasonal variations was of loss from falling prices, except only during three days in November 1950 and

eighteen days in December 1950 when plaintiff's position was long or even.

22. The aforementioned only two exceptions to the consistency of plaintiff's short position and the losses sustained from them by plaintiff were due to the interruption in the seasonal variation of egg actuals prices by the events of the war in Korea. Between September 15, 1950 and November 2, 1950 the United Nations' offensive progressed successfully to the Manchurian Border. During the week of November 3, 1950 the Chinese Communist Armies intervened, General McArthur gave notice of such intervention to the United Nations in New York City and the United Nations armies began their retreat to the 38th parallel. Immediately "the" egg "market went wild."

23. The wholesale price of fresh eggs in New York rose from 55½ cents per dozen on November 8, 1950 to 80 cents per dozen on December 8, 1950 then fell to 59 cents per dozen on December 26, 1950; the commodity price of January futures eggs rose from 32 cents per dozen on November 3, 1950 to 43½ cents per dozen on December 7, 1950 then fell to 37 cents per dozen on December 20, 1950. Plaintiff sustained losses in trying to deal with his futures commitments "as best" he "could."

24. Since the prices of egg futures follow the prices of egg actuals, plaintiff could not reasonably have anticipated, when he entered into the short sales transactions, that he could profit from the short sales transactions without having such profit reduced by a loss in his actuals transactions nor could he reasonably have anticipated that he could profit from his actuals transactions without losing on his short sales.

25. If plaintiff's purpose in entering into short sales transactions had not been to protect his business, he could as easily have entered into short sales transactions on the futures market of a commodity other than eggs where the prices of the futures would not have followed the prices of his own actuals and where therefore profit to him would have been at least possible in both futures and actuals.

26. Since the prices of egg futures follow the prices of egg actuals, and since plaintiff entered into futures transactions in longs to be open during the period of the seasonal risk of scarcity, plaintiff could reasonably have anticipated that such futures transactions in longs, at comparatively little or no cost or even at a profit, would help protect his actuals business from the risk of scarcity.

27. Although there are a number of commodity futures markets open to the public, plaintiff has never entered into any futures transaction in any commodity or on any market except egg futures on the egg futures market.

28. In 1949 plaintiff made profits from short sales in the January 1950 futures market and paid income tax on 100% of said profits. In 1950, plaintiff again dealt in shorts on the 1951 January futures market, but this time he suffered losses when the "market went wild" as a result of the aforementioned events of the Korean War. In attempting to extricate himself as best he could from his commitments on the January 1951 futures market, plaintiff closed out all seven of his said shorts and entered into and closed out two longs, sustaining losses in all nine transactions.

29. All of said 1950 transactions on the January 1951 futures market were entered into by plaintiff as hedging transactions against the seasonal trends of production and prices of egg actuals.

30. Plaintiff's losses from futures transactions in the egg commodity futures market in 1950 amounted to $23,633.60 which amount included losses from short sales in the amount of $13,427.60 and losses in 1950 from transactions on the futures market known as the January 1951 futures market in the amount of $16,131.60.

## Discussion

It is plaintiff's contention that his dealings in futures were "hedging transactions" rather than speculative trans-

actions, accordingly they were essentially to be regarded as insurance rather than dealing in capital assets and that gains and losses therefrom were ordinary business gains and losses.

Plaintiff argues, in support of his position, that the evidence disclosed the following:

A. Timing. For not less than seventy-five years immediately prior to 1950 there was a seasonal variation in the prices of fresh eggs in the New York City market where plaintiff sold his eggs, from a high in the autumn to a low in the late winter or early spring. This seasonal variation was due to two factors: number of layers and rate of lay. Because of the seasonal variation in production, plaintiff had two business risks: (1) the risk of loss during the period of falling price from which his loss amounted to $7,000 to $10,000 per year; and (2) the risk of scarcity during the period of rising price.

Since the prices of egg futures follow the prices of egg actuals, plaintiff entered into futures, short during the period of the seasonal risk of loss from falling actuals prices, long during the period of the seasonal risk of scarcity, and fluctuating during the periods of transition from one risk to another.

B. Quantity. Plaintiff's inventory was from "three to four thousand cases of eggs." A carload is equivalent to 480 cases. Therefore, plaintiff's inventory was from $6\frac{1}{4}$ to $8\frac{11}{12}$ carloads. For the 158 days from January 1, 1950 to March 10, 1950 and from October 3, 1950 to December 31, 1950, when the risk was a falling price, plaintiff's balance of short transactions aggregated 1078 carload-days or an average of only 6.8 carloads. Therefore there was close conformity in quantity between the subject of the risk of falling price and the subject of short sales.

For the 207 days from March 10, 1950 to October 3, 1950, when the risk was of scarcity, plaintiff's balance of long transactions aggregated 3063 carload days or an average of only $14\frac{8}{10}$ carloads, less than three of his average inventories and, since the time of an egg in inventory varied from two to five days, a margin of protection against scarcity of less than three weeks' supply.

C. Commodity. Eggs were the subjects of both the risks of dealings in actuals and of the dealings in futures. The prices of egg futures follow the prices of egg actuals. Any spread between the two is kept to a minimum by straddling. Although there are a number of commodity futures markets open to the public, plaintiff has never entered into any futures transaction in any commodity or on any market except egg futures on the egg futures market.

D. Consistency of Activity. Plaintiff's position was long consistently and without exception for the nearly five months between March 20, 1950 and August 10, 1950 during the period when the prevailing risk due to said seasonal variation was of scarcity. Plaintiff's position was fluctuating only from March 10, 1950 to March 20, 1950 and from August 10, 1950 to October 3, 1950 during the periods when the prevailing risk due to said seasonal variation was changing. Plaintiff's position was consistently short for the more than five months aggregated by the periods from January 1, 1950 to March 10, 1950 and from October 3, 1950 to December 31, 1950, when the prevailing risk due to the aforementioned seasonal variation was of loss from falling prices, except only during three days in November 1950 and eighteen days in December 1950 when plaintiff's position was long or even during the extraordinary war conditions of the Korean War.

Defendant contends, on the contrary, that plaintiff's activities in the futures market represented a series of speculative transactions and that, accordingly, the losses therefrom were properly treated as capital losses.

In Corn Products Refining Co. v. Commissioner of Internal Revenue, 1955, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29, the

taxpayer dealt in corn. Its storage facilities were limited and therefore its inventory was necessarily small and as a consequence it found itself unable to buy at a price to successfully meet competition. Droughts in the corn belt had caused a sharp increase in the price of spot corn. Quoting from the opinion, 350 U.S. at page 48, 76 S.Ct. at page 22,

"* * * To avoid a recurrence of this situation, petitioner, in 1937, began to establish a long position in corn futures 'as a part of its corn buying program' and 'as the most economical method of obtaining an adequate supply of raw corn' without entailing the expenditure of large sums for additional storage facilities. At harvest time each year it would buy futures when the price appeared favorable. It would take delivery on such contracts as it found necessary to its manufacturing operations and sell the remainder in early summer if no shortage was imminent. If shortages appeared, however, it sold futures only as it bought spot corn for grinding. In this manner it reached a balanced position with reference to any increase in spot corn prices. It made no effort to protect itself against a decline in prices.

"In 1940 it netted a profit of $680,587.39 in corn futures, but in 1942 it suffered a loss of $109,969.-38. In computing its tax liability Corn Products reported these figures as ordinary profit and loss from its manufacturing operations for the respective years. It now contends that its futures were 'capital assets' under § 117 and that gains and losses therefrom should have been treated as arising from the sale of a capital asset. In support of this position it claims that its futures trading was separate and apart from its manufacturing operations and that in its futures transactions it was

acting as a 'legitimate capitalist'.
* * * * "

As above noted, Corn Products made no effort to protect itself against a decline in prices. On this phase of the case the Court stated:

"Petitioner also makes much of the conclusion by both the Tax Court and the Court of Appeals that its transactions did not constitute 'true hedging.' It is true that Corn Products did not secure complete protection from its market operations. Under its sales policy petitioner could not guard against a fall in prices. It is clear, however, that petitioner feared the possibility of a price rise more than that of a price decline. It therefore purchased partial insurance against its principal risk, and hoped to retain sufficient flexibility to avoid serious losses on a declining market.

"Nor can we find support for petitioner's contention that hedging is not within the exclusions of § 117 (a). Admittedly, petitioner's corn futures do not come within the literal language of the exclusions set out in that section. They were not stock in trade, actual inventory, property held for sale to customers or depreciable property used in a trade or business. But the capital-asset provision of § 117 must not be so broadly applied as to defeat rather than further the purpose of Congress. * * * Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by § 117 applies to transactions in property which are not the normal source of business income. It was intended 'to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such con-

versions.' * * * Since this section is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly. This is necessary to effectuate the basic congressional purpose. This Court has always construed narrowly the term 'capital assets' in § 117. * * *

"The problem of the appropriate tax treatment of hedging transactions first arose under the 1934 Tax Code revision. Thereafter the Treasury issued G. C. M. 17322, supra, distinguishing speculative transactions in commodity futures from hedging transactions. It held that hedging transactions were essentially to be regarded as insurance rather than a dealing in capital assets and that gains and losses therefrom were ordinary business gains and losses. The interpretation outlined in this memorandum has been consistently followed by the courts as well as by the Commissioner. While it is true that this Court has not passed on its validity, it has been well recognized for 20 years; and Congress has made no change in it though the Code has been re-enacted on three subsequent occasions. This bespeaks congressional approval. * * * Furthermore, Congress has since specifically recognized the hedging exception here under consideration in the short-sale rule of § 1233(a) of the 1954 Code."

The Court held that taxpayer's purchases and sales of corn futures, though not "true hedges," were an integral part of its business and were not capital-asset transactions under § 117(a) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 117(a), and that gains and losses therefrom gave rise to ordinary income and ordinary deductions.

Here plaintiff because of the seasonal variation in the production of fresh eggs, had two business risks: (1) the risk of loss during the period of falling prices and (2) the risk of scarcity during the period of rising prices. Plaintiff entered into transactions in the egg futures commodity market as hedging transactions for the purpose of protecting his business against the uninsurable risks of loss and scarcity due to the seasonal variation in production of egg actuals. He also entered into short sales transactions open during the period of the seasonal risk of loss from falling actuals prices, again as hedging transactions for the purpose of protecting plaintiff's business from loss from such falling actuals prices by gains from futures.

It seems to me that this procedure is entirely consonant with Corn Products, where taxpayer admittedly only sought partial insurance.

Defendant's two experts were not, in my judgment, convincing and, indeed, were not in complete accord.

It is my conclusion that plaintiff's losses sustained on commodity egg futures transactions during the year 1950 constitute ordinary losses incurred in a trade or business under Section 23(e) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23(e).

Conclusions of Law

1. The Court has jurisdiction over the parties and subject matter of this action.

2. The net loss sustained by plaintiff in transactions in egg futures was loss from hedging transactions.

3. The net loss sustained by plaintiff from hedging transactions in egg futures was deductible as ordinary loss.

4. Plaintiff was entitled to deduct in full as ordinary loss the losses sustained by him in 1950 in transactions in egg futures aggregating $23,633.60, and therefore is entitled to judgment in the amount of $5,835.60 with interest thereon at six per cent. per annum from July 31, 1951.