Everett B. Gee and Johnnie T. Gee v. Commissioner.
Gee v. Commissioner
Docket No. 93527.
United States Tax Court
T.C. Memo 1964-162; 1964 Tax Ct. Memo LEXIS 174; 23 T.C.M. (CCH) 956; T.C.M. (RIA) 64162; June 10, 1964
Leon B. Catlett, 727 Pyramid Life Bldg., Little Rock, Ark., for the petitioners. Walter O. Johnson, for the respondent. DAWSON
Memorandum Opinion DAWSON, Judge: Respondent determined a deficiency in the income tax of petitioners for the taxable year ended June 30, 1958, in the amount of $17,435.86. The only issue for decision is whether a loss of $29,417.75 sustained by petitioners from the sale of commodity futures contracts in cotton, cotton seed oil, *175 and soybeans is an ordinary business loss or a capital loss. All of the facts have been stipulated by the parties and are adopted as our findings herein. Everett B. Gee and Johnnie T. Gee (hereinafter called petitioners) are husband and wife who resided in Blytheville, Arkansas. They filed a joint income tax return for the taxable year ended June 30, 1958, with the district director of internal revenue, Little Rock, Arkansas. During the fiscal year ended June 30, 1958, and for many years prior thereto, the petitioners, doing business as E. B. Gee Cotton Company, were engaged in leasing large tracts of land to various tenants for the production of cotton and soybeans, in operating cotton gins and grain elevators, and in buying and selling cotton and soybeans. The petitioners' business operations were in southeast Missouri and northeast Arkansas. During the fiscal year ended June 30, 1958, petitioners made spot purchases and sales of cotton and soybeans. Sales were made from spot purchases and the inventory on hand at the beginning of the fiscal year. The petitioners' spot purchases and sales were made in an attempt to derive a profit in the operation of their trade or business *176 known as E. B. Gee Cotton Company. Petitioners made the following spot purchases of commodities in the fiscal years ended June 30, 1957, and June 30, 1958: Lint Cotton
Cotton Seed
Soybeans
Corn & Wheat
FYE 6-30-57
$2,565,388.97
$10,327.02
$812,128.23 [1]
FYE 6-30-58
780,320.86
70,947.48
630,732.29
$13,184.29
Petitioners' spot purchases of commodities in the fiscal year ended June 30, 1958, were not required to meet prior sale commitments and were made for delivery at the price prevailing at the time of delivery of the commodity. In the operation of the E. B. Gee Cotton Company petitioners maintained the following inventories on the dates indicated: Commodity
June 30, 1956
June 30, 1957
June 30, 1958
Lint Cotton
$ 42,750.00
$159,357.57
$56,000.00
Soybeans, Corn, and Wheat
312,288.00
246,576.41
None The above inventories do not include commodities purchased on futures contracts. During the period July 1, 1957, to June 30, 1958, petitioners bought and sold the following commodity futures contracts: Date
Purchased
Date Sold
Commodity
Profit
Loss
July 10, 1957
Aug. 26, 1957
Cotton seed oil
0
$ 2,419.50
July 12, 1957
Aug. 26, 1957
Cotton
0
2,625.00
July 12, 1957
Aug. 26, 1957
Cotton
0
5,515.00
July 12, 1957
Aug. 26, 1957
Cotton seed oil
0
1,881.00
July 17, 1957
Sept. 17, 1957
Soybeans
0
7,141.75
Nov. 8, 1957
Mar. 27, 1958
Cotton
$ 810.00
0
Nov. 13, 1957
Apr. 2, 1958
Cotton
1,775.00
0
Nov. 18, 1957
June 4, 1958
Cotton seed oil
0
6,826.50
Dec. 9, 1957
Apr. 2, 1958
Cotton seed oil
0
2,739.00
Dec. 9, 1957
Apr. 15, 1958
Cotton
0
240.00
Dec. 9, 1957
Apr. 14, 1958
Cotton
0
720.00
Dec. 9, 1957
Apr. 11, 1958
Cotton
0
230.00
Apr. 2, 1958
June 4, 1958
Cotton seed oil
0
1,665.00
Gross Profit or Loss
$2,585.00
32,002.75
2,585.00
Loss sustained in trading commodity futures contracts
($29,417.75)
*177 During the fiscal year ended June 30, 1958, the petitioners were "long" in their trading in commodity futures in cotton, cotton seed oil, and soybeans. Their contracts in commodity futures were to receive at a future date a commodity purchased as opposed to a contract to deliver a commodity sold. Futures contracts were entered into with intention not to demand or receive delivery of the commodity. No actual deliveries of the commodities purchased under futures contracts were received by petitioners. At the time of the petitioners' purchases of commodity futures contracts in July 1957, the 1957 crop prospects for cotton and soybeans were below the annual average. The actual farm production of cotton in the crop year 1957 in the petitioners' locality amounted to approximately one-third of the crop yield of the preceding harvest of cotton. The petitioners' purchase of commodity futures contracts in the fiscal year ended June 30, 1958, was entered into for profit based on the law of supply and demand. It was anticipated that a lower production yield would be accompanied by price increases of cotton and soybeans. In years prior to the fiscal year ended June 30, 1958, petitioners *178 had bought and sold commodity futures contracts in cotton and soybeans. In the fiscal year ended June 30, 1958, the petitioners had no contracts or agreements requiring them to deliver on a future date at a certain designated price any cotton, soybeans or products that may be derived therefrom. In their income tax return for the fiscal year ended June 30, 1958, the petitioners deducted as an ordinary loss the sum of $29,417.75 which resulted from the sale of their commodity futures contracts. Respondent, in his notice of deficiency, determined that the petitioners sustained a capital loss from the sale thereof. The issue here presented involves sections 165[2] and 1221 [3] of the Internal Revenue Code of 1954. Except for hedges, commodity futures contracts are capital assets. United States v. Rogers, 286 F. 2d 277 (C.A. 6, 1961), certiorari denied 366 U.S. 951 (1961); and L. M. Muldrow, 38 T.C. 907 (1962). *179 Petitioners maintain that the loss they suffered from trading in commodity futures contracts was attributable to "protecting their business against crop failure" and was "related to their business of purchasing and selling the actual commodities." Although the petitioners acknowledge on brief that their futures transactions did not constitute a "true hedge," they nevertheless assert that such transactions were an integral part of their regular business and under the decision in Corn Products Refining Company v. Commissioner, 350 U.S. 46 (1955), the loss was an ordinary one and deductible in full. Respondent, on the other hand, argues that petitioners' dealings in commodity futures contracts were not hedges and were also not an integral part of the business. We agree with the respondent. In United States v. New York Coffee and Sugar Exchange, Inc., 263 U.S. 611 (1924), the Supreme Court pointed out that those who deal in commodity futures are divided into three classes: First, those who use them to hedge, * * *; second, legitimate capitalists, who, exercising their judgment as to the conditions, purchase or sell for future delivery with a view to profit *180 based on the law of supply and demand; and, third, gamblers or irresponsible speculators, who buy or sell as upon the turn of a card. We think it is clear from the stipulated facts of this case that the trading by petitioners was not a hedging transaction. There is nothing to show any relationship between the petitioners' purchases and sales of spot cotton and soybeans in the operation of their business and their trading in commodity futures in cotton and soybeans. During the fiscal year in question petitioners were long in both spot purchases and commodity futures contracts. Unlike the taxpayers in the cases of Fulton Bag and Cotton Mills, 22 T.C. 1044 (1954), and Kenneth S. Battelle, 47 B.T.A. 117 (1942) the petitioners were not selling futures in order to protect themselves against a price decline with respect to the cotton and soybean inventory kept in the operation of their business. Indeed, an examination of the 13 futures contracts entered into by petitioners during the fiscal year ended June 30, 1958, shows that in each instance they were buying futures. They sold only futures which they had previously purchased. In the event of a price decline of *181 the commodities which the petitioners acquired by spot purchases and maintained as an inventory in the operation of their business, their trading in commodity futures offered them no protection. If the market price of cotton and soybeans declined, petitioners stood to lose with respect to both their inventory and their commodity futures contracts. If the price increased, they would make a profit on both their inventory and commodity futures. There was no balancing effect as is normally found in a hedging transaction. These petitioners fall squarely within the Supreme Court's definition of "legitimate capitalists." By exercising their best judgment which was fortified by many years of experience in the cotton and soybean business, the petitioners anticipated a general increase in the price of cotton and soybeans because of an expected decrease in crop production. Based on such information and being familiar with the law of supply and demand, petitioners reasonably assumed that they could realize a profit by purchasing commodity futures for sale at a later date. Unfortunately they erred and instead of realizing a profit they suffered a loss. This, of course, is a risk any investor *182 must assume. The main thrust of petitioners' argument is that, since a portion of their business operation dealt with the purchase and sale of spot cotton and soybeans, any transactions which they might have with respect to the same commodities in futures contracts must necessarily be considered an integral part of their everyday business operations. They rely on several cases involving the tax treatment of futures transactions which we believe are distinguishable on their facts. We see no similarity between Corn Products Refining Company, supra, and this case. The petitioners were not in the manufacturing business. This is not a case in which futures were purchased to secure an adequate supply of cotton and soybeans in the operation of the petitioners' business. Profit based on the law of supply and demand was their motive in purchasing commodity futures contracts, and not the protection of their business from possible scarcity of cotton and coybeans. The petitioners stipulated that futures contracts were entered into with the intention of neither demanding nor receiving delivery of the commodity. In Ben Grote, 41 B.T.A. 247 (1940), the taxpayer was *183 a wheat farmer who engaged in trading in wheat futures on the Chicago Board of Trade. During the year involved he entered into 15 separate futures contracts, 12 of which were transactions in which he sold wheat futures short; i.e., he entered into a contract for the sale of wheat at a future date as opposed to a contract to purchase. By so doing he protected his wheat crop from a possible fluctuation in the market price of wheat. Any loss which he would incur by a decline in the price of wheat prior to harvest and sale would be offset by a corresponding gain in his futures transactions. In contrast to Grote, all of the commodity futures contracts entered into by the petitioners were to purchase commodities at a future date. Whereas Grote was short in futures, the petitioners were at all times long in futures. Their transactions offered them no protection whatsoever from a possible fluctuation in the price of cotton and soybeans. In Mansfield Journal Co. v. Commissioner, 274 F. 2d 284 (C.A. 6, 1960), affirming 31 T.C. 902 (1959), the taxpayer was a newspaper publisher who contracted to purchase at future dates a fixed amount of newsprint at a determinable *184 price in order to protect itself against erratic prices and lack of availability of newsprint. In holding that this transaction was an integral part of the publishing company's business, we found that it gave the company insurance against being forced to buy newsprint at uncertain, spot-market prices, and from being deprived of a supply of newsprint. Neither of these factors is present in the instant case, as we have previously indicated. The case of Wool Distributing Co., 34 T.C. 323 (1960), is much like the Grote case, supra. It was a situation, unlike the present case, where the taxpayer sold futures short in order to protect his investment in an inventory. In that case we held that such transactions were in the nature of a bona fide hedging operation providing a form of price insurance protecting the taxpayer's large inventory of foreign wool against a reasonably anticipated currency devaluation. We do not see the slightest resemblance between a bona fide hedging transaction and what transpired here. The petitioners cite the case of Weiler v. United States, 187 F. Supp. 742 (M.D. Pa. 1960) as being directly in point. Weiler was engaged in the egg *185 wholesaling business and in connection therewith had obligated himself to meet the demands of his single buyer. This required that he maintain a reliable source of supply, which he did by buying long on egg futures. The petitioners had no such obligations. Weiler's experience in the egg business had taught him that during a portion of each year when eggs were plentiful the price thereof would decline. In order to protect himself during the periods when the price of eggs was likely to decline, Weiler sold egg futures short, which enabled him to offset any loss with respect to his inventory by a gain on his futures. The petitioners' transactions provided them with no insurance with respect to their inventory investment. In Weiler, the District Court found the taxpayer's futures transactions were hedging transactions. The petitioners have conceded in their brief that their trading in commodity futures did not constitute a "true hedge." In our opinion the facts clearly demonstrate that the Weiler case is not controlling here. Accordingly, we hold on these facts that the petitioners' transactions in commodity futures contracts were neither hedges nor an integral part of their business. *186 The loss was a capital one. Decision will be entered for the respondent. Footnotes
1. Includes corn and wheat purchases.↩
2. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance of otherwise. * * *
(c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; * * *
(f) Capital Losses. - Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212. ↩
3. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;↩