PATTON & RICHARDSON, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Patton & Richardson, Inc. v. Commissioner
Docket No. 3470-76.
United States Tax Court
T.C. Memo 1981-288; 1981 Tax Ct. Memo LEXIS 460; 42 T.C.M. (CCH) 70; T.C.M. (RIA) 81288; June 11, 1981
*460 P, a cotton merchant, bought and sold cotton futures and incurred losses. Held, such losses constituted capital losses and not ordinary losses since P failed to prove that it traded futures for reasons other than to take speculative positions in the cotton market. Joseph B. Alala, Jr., and Steve C. Horowitz , for the petitioner. Frank C. McClanahan III, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in the petitioner's Federal income taxes: Taxable Year Ending
Deficiency
March 31, 1970
$ 60,541.03
March 31, 1971
9,869.39
March 31, 1972
13,142.02
March 31, 1973
114,345.14
The only issue to be decided is whether the losses incurred by the petitioner in 1972 in cotton futures transactions constituted ordinary or capital losses. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioner, Patton & Richardson, Inc., was a dissolved North Carolina corporation which maintained its principal place of business in Gastonia, N.C., during the taxable years in issue. [1] It filed its corporate Federal income tax returns on the basis of a taxable year ending on March 31, and we shall identify each taxable year by the calendar year in which it ended. It filed its corporate tax returns for its taxable years 1970 and 1971 with the *462 Internal Revenue Service Center in Chamblee, Ga., and for its taxable years 1972 and 1973, with the Service Center in Memphis, Tenn.
The petitioner was formed in 1953. During the years in issue, it was engaged in business as a cotton merchant; that is, it bought and sold cotton. To some extent, the petitioner bought and sold cotton on its own account and thereby realized as profit the difference between its sales receipts and the cost of its purchases. In addition, the petitioner arranged purchases and sales of cotton as an agent for producers and consumers of cotton as an agent for producers and consumers of cotton and earned commissions for its services. One of the petitioner's large clients for such services was the Plains Cotton Cooperative Association (Plains Cotton). Plains Cotton marketed the cotton produced by farmers in West Texas and Oklahoma. During the years in issue, the petitioner was owned equally by Henry C. Patton and Paul L. Richardson. Mr. Patton and Mr. Richardson each served as an officer of the corporation, and together they managed the *463 company. During such years, the petitioner owned negligible fixed assets and, except for the amounts paid as compensation to Mr. Patton and Mr. Richardson, incurred negligible expenses for salaries and wages. Prior to 1971, when the petitioner traded in cotton, it dealt primarily with actual producers and consumers of cotton. However, in 1971, the petitioner began to deal also with one or more of the cotton futures exchanges. Essentially, a cotton futures exchange enters into standardized contracts with producers, consumers, and others to buy and sell standard grades of cotton in the future. When a trader contracts with a cotton exchange to buy cotton in the future, he is said to "buy futures." If a trader purchases futures, he enters into a contract to take delivery of cotton in a set future month and to pay a fixed price for it. Such a trader then holds a "long" position in the cotton market, and he will realize a gain when the market price of cotton rises since the value of the cotton to which he is entitled exceeds the price which he must pay. Similarly, if the market price declines, such a trader will incur a loss. On the other hand, when a trader contracts to sell, *464 he agrees to deliver cotton in some specified future month and to accept a fixed price for it. Such a trader is said to "sell futures," and he holds a "short" position in the market. Such a trader will realize a gain when the market price declines since he is entitled to receive a price which exceeds the then market value of the cotton. Of course, such a trader will incur a loss if the price of cotton rises. A standard cotton futures contract requires the delivery of 100 bales of cotton. From October 12, 1971, until July 10, 1972, the petitioner entered into futures contracts as follows: Futures Trading Oct. 12, 1971 through July 10, 1972 (Figures in parentheses represent contracts to sell; figures without parentheses represent contracts to purchase) [SEE TABLE IN ORIGINAL] As the table shows, during the period from October 12, 1971, through July 10, 1972, the petitioner established, and then eliminated, long positions with respect to December 1971, March 1972, May 1972, and July 1972 futures. As the table also shows, during such period, the petitioner established, but did not eliminate, a long position with respect to October 1972 futures and short positions with respect *465 to December 1972, March 1973, and May 1973 futures. During 1971 and the first part of 1972, cotton prices in the United States steadily rose. However, in mid-1972, prices began to decline. As a result, the petitioner was asked by its brokers to deposit funds to secure its long position; that is, to secure its obligation to purchase cotton in October at fixed prices. The petitioner failed to make the deposits, and all of its positions in the futures market were therefore closed out by its brokers shortly after July 10, 1972. During its taxable year 1972, the petitioner realized gains of $ 15,794.50 from its futures trading, and on its corporate Federal income tax return for such year, the petitioner reported such gain as ordinary income. During its taxable year 1973, the petitioner incurred losses of $ 465,772.50 in its futures trading. On its tax return for such year, the petitioner deducted such losses as ordinary losses, and as a result of the deduction, the petitioner reported a net operating loss for such year. It treated such loss as a carryback to its taxable years 1970 through 1972. In his notice of deficiency, the Commissioner determined that the gains and losses *466 reported by the petitioner from futures transactions were capital in character and not ordinary. As a result of his determination with respect to the losses, he also determined that the petitioner had taxable income for its taxable year 1973 and that, therefore, the petitioner was not entitled to the loss carrybacks claimed for 1970 through 1972. OPINION The only issue to be decided is whether the losses incurred by the petitioner in its taxable year 1973 as a result of its trading in cotton futures were capital losses or ordinary losses. The petitioner and the Commissioner agree that our decision on such issue will also determine the character of the gains realized by the petitioner in its taxable year 1972. Section 165 of the Internal Revenue Code of 1954[2] provides the general rule that a taxpayer other than an individual may deduct any losses sustained during the taxable year. However, section 1211(a) provides that capital losses are deductible by a corporation only to the extent of capital gains. *467 A capital loss is defined in section 1222 as a loss from the sale or exchange of a capital asset, and a capital asset is defined in section 1221 as including all property held by a taxpayer, except for the six categories of properties described in such section. In this case, the petitioner does not contend that the contract rights acquired by it when it bought and sold cotton futures were included in the exceptions to section 1221. Nevertheless, the petitioner takes the position that such rights were not capital assets, and in support of its position, it relies on the decision of the Supreme Court in Corn Products Refining Co. v. Commissioner, 350 U.S. 46 (1955). In Corn Products, the taxpayer was a manufacturer of corn sugar and other products made from corn. In 1934 and 1936, there were shortages of corn, and as a result, the taxpayer was unable to buy corn at a price which would permit its corn sugar to be competitive with cane and beet sugars. Thereafter, to protect itself from abnormally high prices caused by shortages, the taxpayer *468 periodically began to establish a long position in corn by buying corn futures. By establishing a long position, the taxpayer assured itself of adequate supplies of corn at fixed prices; if the price of corn rose while the taxpayer held a long position in futures, then in order to replenish its supplies of corn, the taxpayer either took delivery on the futures contracts or, alternatively, sold the contracts at a profit and used the profit to subsidize its purchases of corn at the higher market prices. In 1940, the taxpayer realized a net gain in its futures transactions, and it reported such gain as capital gain. The Commissioner contended that the gain constituted ordinary income, and the Supreme Court agreed. The Court conceded that the contract rights acquired by the taxpayer in futures transactions were not literally included in the exceptions to the definition of a capital asset. However, the Court reasoned that the futures transactions "were vitally important to the company's business as a form of insurance against increases in the price of raw corn," that "Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary *469 income or loss rather than capital gain or loss," and that, therefore, the profits from the futures transactions were ordinary income. 350 U.S. at 50, 52. Here, the petitioner similarly takes the position that its futures transactions were vitally important to its business. It argues first that as in Corn Products, its futures transactions served to offset market risks created by its everyday operations and therefore represented a form of insurance for the business. It argues alternatively that if its futures transactions did not serve to offset risks, but merely served to create speculative positions in the cotton market, then such transactions were nonetheless important to its business; it contends that the nature of the business of a cotton merchant is speculation and that futures transactions are a simple and alternative means of taking speculative positions in the cotton market. Initially, it is clear that the petitioner has failed to prove that there is any merit in its first argument; it appears that its futures transactions constituted simple speculation. Primarily, there is no evidence to show that the petitioner bore any risks which were offset by *470 its futures transactions. We know that during the period when it traded futures, the petitioner established, and then eliminated, long positions with respect to December 1971, March 1972, May 1972, July 1972, and October 1972 cotton futures and short positions with respect to December 1972, March 1973, and May 1973 futures. Yet, to show that these positions offset other positions taken by the petitioner off the futures market, the petitioner relies on a document prepared by it for trial purporting to show only that at all times from October 12, 1971, through July 10, 1972, the petitioner held a short position off the futures market. Specifically, the document purports to show that throughout such period, the petitioner possessed contractual obligations to sell cotton to customers in the future and that, therefore, throughout the period, the petitioners bore the risk that the price of cotton would rise. However, if the petitioner in fact held a short position off the futures market during the time when it was also involved in the futures market, then there would have been no reason to establish any short positions in the futures market. As we have said, the petitioner established *471 several short positions during period. Moreover, even if the petitioner had held no short positions in the futures market, the mere existence of long positions in the futures market and short positions elsewhere does not imply that such positions were offsetting; for example, the risk of a contract to sell cotton in July is not offset by a contract to purchase cotton in November. Yet, the document relied on by the petitioner wholly disregards the closing dates of the sales contracts off the futures market, and without those dates, the document is meaningless. In addition, there is stipulated evidence showing that from October 12, 1971, through July 10, 1972, substantially all the cotton which the petitioner, at any one time, was bound by contract to sell, was to be delivered within 30 days after the date of the contract. Thus, when the petitioner bought May 1972, July 1972, and October 1972 futures in early 1972, there was no substantial short position, for such months, to be offset. More fundamentally, the document relied on by the petitioner is wholly defective inasmuch as it attaches significance only to sales. The petitioner not only sold cotton, but also purchased it. *472 Evidence submitted by the petitioner itself shows that during the period when the petitioner traded in futures, its undelivered purchases of cotton were at all times roughly equal to its undelivered sales. Accordingly, if the petitioner's sales created a short position, then its purchases created an offsetting long position, and the futures transactions constituted speculation. That the futures transactions constituted speculation is shown also by their results. If such transactions had been designed to offset, and not create, risk, then any losses in such transactions would have produced corresponding gains elsewhere. Yet, when the price of cotton fell in mid-1972 and the petitioner incurred losses on its long futures contracts, there were no offsetting gains; rather, according to Mr. Patton, when the price fell, the petitioner was "wiped out." On brief, the petitioner relies on Weiler v. United States, 187 F. Supp. 742 (M.D. Pa. 1960). There, the court held that the taxpayer was entitled to deduct as ordinary losses the losses sustained by it in futures trading. However, in that case, the court found that the taxpayer had engaged in futures trading "for *473 the purpose of protecting his business against the uninsurable risks of loss and scarcity due to the seasonal variation in production of egg actuals." 187 F. Supp. at 748. Here, as we have said, the petitioner has not shown that it traded futures in order to protect its business, and for that reason, we reject the petitioner's argument that its futures transactions were vitally important to its business as insurance against risk. The petitioner's other argument in support of the application of Corn Products to this case depends precisely on our conclusion that the petitioner's futures transactions constituted speculation. As we said, the petitioner argues that risk-taking is the substance of the business of a cotton merchant; in support of that argument, the petitioner introduced the testimony of several witnesses, including that of W. D. Lawson III and Hurdle H. Lea, who were highly experienced cotton merchants and highly credible witnesses.According to Mr. Lawson and Mr. Lea, cotton merchants who buy and sell on their own account are highly competitive. Mr. Lawson and Mr. Lea stated that as a result of the competition, at any one time, there is usually an insignificant *474 difference between the lowest price at which such a merchant can buy and the highest price at which he can sell and that, in order to be profitable, such a merchant usually must speculate as to changes in the market price of cotton. In other words, according to Mr. Lawson and Mr. Lea, since such a merchant is unable to buy cotton and resell it immediately at a profit, he must either buy in anticipation of price rises or sell in anticipation of price declines. Mr. Lawson and Mr. Lea further explained that when a merchant assumes a risk in the market, he concomitantly reduces the risk borne by a cotton producer or consumer. For example, according to them, if a textile mill needs a quantity of cotton 6 months in the future in order to fulfill contracts to deliver textiles, and if a rise in the price of cotton over the 6 months would cause the contracts to be unprofitable, then it can shift the risk of price increases to a merchant by contracting to buy cotton currently for delivery in 6 months. Similarly, if a farmer fears that a decline in the price of cotton prior to the harvest could cause his harvest to be unprofitable, he can sell his unharvested crop, either by the bale or by *475 the acre, to a merchant and thereby shift to the merchant the risk of a price decline. According to Mr. Lawson and Mr. Lea, when a cotton merchant buys and sells on his own account, he is in the business of taking risks. In their view, for such a merchant, the futures market is an alternative means of taking risks, and such market is not only a basic aspect of the merchant's business, but is vitally important since it affords the merchant flexibility and speed in taking positions in the market. For example, if on July 1 a merchant contracts to purchase a farmer's fall harvest, and on July 2 he concludes that the cotton market is declining, he is able to reverse his long position without delay by selling futures; if he sought to assign his long contract or otherwise find a buyer for the farmer's cotton, it is possible that prices will decline before his long position is offset. The testimony of Mr. Lawson and Mr. Lea is strong support for the petitioner's argument that futures trading is important to cotton merchants who buy and sell on their own account. Nevertheless, such testimony does not lead us to conclude that the losses incurred by the petitioner in its futures trading *476 were ordinary business losses. Primarily, the petitioner has wholly failed to show that its business was like that of the typical cotton merchant described by Mr. Lawson and Mr. Lea or that, for the petitioner, futures transactions were closely related to its other business activities. To begin, Mr. Patton admitted at trial that before 1971 the petitioner traded in futures very infrequently. He explained that prior to the 1970s, cotton stocks of the Commodity Credit Corporation were large and the cotton loan-support price of the U.S. Department of Agriculture was high and that, as a result, there was little risk for the merchant and therefore little reason to trade in futures. However, that explanation is unsatisfactory: If, as the petitioner contends, it was necessary in the 1970s for a merchant to trade in futures in order to profit from price fluctuations and thereby be competitive, then unless cotton prices did not fluctuate in the 1950s and 1960s, it was also necessary for a merchant to trade in futures during such years. In fact, statistics which were introduced in evidence concerning cotton show that the price of cotton was by no means constant during the 1950s and 1960s, *477 and we must conclude that if futures transactions were vital to the petitioner during 1971 and 1972, they would have been vital in earlier years. More importantly, the petitioner has failed to show that it bought and sold significant quantities of cotton on its own account, as did the typical merchants described by Mr. Lawson and Mr. Lea. It is stipulated that during the years in issue the petitioner did trade on its own account, but it is not stipulated to what extent the petitioner engaged in such trading. Copies of contracts memorializing most or all of the petitioner's purchases and sales of cotton from 1969 through 1972 were admitted in evidence, and such contracts show the petitioner to be the sole buyer or seller in each instance. However, during the years in issue, the petitioner was the sales agent for Plains Cotton, and yet, many of the contracts in evidence show the petitioner as "buying" cotton from Plains Cotton. As the sales agent for Plains Cotton, the petitioner surely did not purchase from Plains Cotton, as from other producers, in the hope of reselling at a profit. Rather, in our opinion, it is likely that the petitioner's "purchases" from Plains Cotton were *478 merely formalizations of transactions arranged by the petitioner between Plains Cotton and a buyer. In fact, most of the contracts between Plains Cotton and the petitioner specify the mill to which delivery of the cotton was to be made. Moreover, in some cases, the contract between Plains Cotton and the petitioner was executed on the same day as a contract between the petitioner and a buyer, for the same cotton at the same price. For example, on January 24, 1972, the petitioner contracted to "purchase" 17,092 bales of cotton from Plains Cotton for 37.85 cents per pound. Such cotton was to be delivered to Elliott, S.C. On the same day, the petitioner contracted to "sell" the same quantity of cotton at the same price to Spring Mills, Inc., for delivery to Elliott, S.C. There are numerous additional sets of such matched contracts, and it is clear that the petitioner's role in such transactions was merely to arrange the sale for third parties and not to assume the market risks involved in buying and selling on its own account. Another contract of sale, executed November 6, 1970, indicates specifically that the petitioner received a commission on the sale; again, if the petitioner *479 received a commission, it is unlikely that the petitioner held a speculative stake in such transaction. The burden of proof is on the petitioner. Rule 142(a), Tax Court Rules of Practice and procedure; Welch v. Helvering, 290 U.S. 111 (1933). From the evidence presented, it appears that the petitioner's principal business may have been the sale of cotton on commission. The petitioner has not produced evidence to rebut that conclusion, and therefore, it has not met its burden of proof. Since the petitioner has not met its burden of proof, we cannot find that its futures transactions were integrally related to its other business: there is nothing in the record to indicate that the petitioner's primary business was not the buying and selling of cotton on commission and that the petitioner's futures transactions did not constitute merely an unrelated, unsuccessful, and short-lived quest for speculative gains. We do not deny that, as Mr. Lawson and Mr. Lea testified, there exist cotton merchants for whom futures transactions are necessary; however, in this case, there has *480 been no showing that the petitioner was such a merchant. Even if the petitioner had shown that it was in the business of buying and selling significant quantities of cotton on its own account, it does not necessarily follow that the petitioner's futures transactions yielded ordinary losses. The typical cotton merchant, according to Mr. Lawson and Mr. Lea, is, in substance, a speculator; he makes a business of profiting from price fluctuations. Yet, in Smith v. Commissioner, 33 T.C. 465 (1959), modified on other issues 313 F. 2d 724 (8th Cir. 1963), the taxpayer similarly conducted a business which bought and sold commodities and commodities futures for speculative profit. The Commissioner took the position that the gains realized by the taxpayer in such transactions constituted ordinary income. However, we held that the gains constituted capital gains since commodities and commodities futures are normally capital assets when traded for speculative profit and since "capital assets will not lose their preferred status merely because the taxpayer engages in a full-time trading" of such assets. 33 T.C. at 485. We stated that the holding *481 of Corn Products was not so broad as to require that the gains resulting from speculation be treated as ordinary income.The same result was reached in Faroll v. Jarecki, 231 F. 2d 281 (7th Cir. 1956), in which the taxpayer was in the business of trading commodities futures for profit. The present case is indistinguishable from Smith v. Commissioner and Faroll v. Jarecki if, as the petitioner contends, its business was merely the speculative trading of cotton and cotton futures. Accordingly, even if such factual contention were accurate, the petitioner's losses were not ordinary losses. Under the circumstances, we conclude that the futures transactions entered into by the petitioner were not integrally related to its business within the meaning of the rule of Corn Products. Accordingly, we hold that the losses incurred by the petitioner in futures transactions were capital losses. Decision will be entered for the respondent. Footnotes
1. It is stipulated that Patton & Richardson, Inc., is the proper party for filing the petition in this case.↩
2. All statutory references are to the Internal Revenue Code of 1954 as in effect during the taxable years in issue.↩