## CORN PRODUCTS REFINING CO. *v.* COMMISSIONER OF INTERNAL REVENUE.

No. 20. Argued October 18, 1955.—Decided November 7, 1955.

*Jay O. Kramer* and *Samuel A. McCain* argued the cause and filed a brief for petitioner.

*Charles K. Rice* argued the cause for respondent. With him on the brief were *Solicitor General Sobeloff, Assistant Attorney General Holland, Charles F. Barber, Ellis N. Slack, Hilbert P. Zarky* and *Harry Marselli.*

MR. JUSTICE CLARK delivered the opinion of the Court.

This case concerns the tax treatment to be accorded certain transactions in commodity futures.[1]  In the Tax Court, petitioner Corn Products Refining Company contended that its purchases and sales of corn futures in 1940 and 1942 were capital-asset transactions under § 117 (a) of the Internal Revenue Code of 1939.  It further contended that its futures transactions came within the "wash sales" provisions of § 118.  The 1940 claim was disposed of on the ground that § 118 did not apply, but for the year 1942 both the Tax Court and the Court of Appeals for the Second Circuit, 215 F. 2d 513, held that the futures were not capital assets under § 117.  We granted certiorari, 348 U. S. 911,[2] because of an asserted conflict with holdings in the Courts of Appeal for the Third, Fifth, and Sixth Circuits.[3]  Since we hold that these futures do not constitute capital assets in petitioner's hands, we do not reach the issue of whether the transactions were "wash sales."

---

[1] A commodity future is a contract to purchase some fixed amount of a commodity at a future date for a fixed price.  Corn futures, involved in the present case, are in terms of some multiple of five thousand bushels to be delivered eleven months or less after the contract.  Cf. Hoffman, Future Trading (1932), 118.

[2] The grant was limited to the following two questions:

"1. Are transactions in commodity futures which are not 'true hedges' capital asset transactions and thus subject to the limitations of Section 117 of the Internal Revenue Code of 1939, or do the resulting gains and losses from such transactions give rise to ordinary income and ordinary deductions?

"2. Are commodity futures contracts 'securities' and thus subject to the 'wash sales' provisions of Section 118 of the Internal Revenue Code of 1939?"

[3] *Makransky's Estate* v. *Commissioner,* 154 F. 2d 59 (C. A. 3d Cir.); *Commissioner* v. *Farmers & Ginners Cotton Oil Co.,* 120 F. 2d 772 (C. A. 5th Cir.); *Trenton Cotton Oil Co.* v. *Commissioner,* 147 F. 2d 33 (C. A. 6th Cir.).

Petitioner is a nationally known manufacturer of products made from grain corn. It manufactures starch, syrup, sugar, and their byproducts, feeds and oil. Its average yearly grind of raw corn during the period 1937 through 1942 varied from thirty-five to sixty million bushels. Most of its products were sold under contracts requiring shipment in thirty days at a set price or at market price on the date of delivery, whichever was lower. It permitted cancellation of such contracts, but from experience it could calculate with some accuracy future orders that would remain firm. While it also sold to a few customers on long-term contracts involving substantial orders, these had little effect on the transactions here involved.[4]

In 1934 and again in 1936 droughts in the corn belt caused a sharp increase in the price of spot corn. With a storage capacity of only 2,300,000 bushels of corn, a bare three weeks' supply, Corn Products found itself unable to buy at a price which would permit its refined corn sugar, cerelose, to compete successfully with cane and beet sugar. To avoid a recurrence of this situation, petitioner, in 1937, began to establish a long position in corn futures "as a part of its corn buying program" and "as the most economical method of obtaining an adequate supply of raw corn" without entailing the expenditure of large sums for additional storage facilities. At harvest time each year it would buy futures when the price appeared favorable. It would take delivery on such contracts as it found necessary to its manufacturing operations and sell the remainder in early summer if no shortage was imminent.

---

[4] Petitioner had contracts with three consumers to furnish, for a period of ten years or more, large quantities of starch or feed. In January 1940, petitioner had sold 2,000,000 bags of corn sugar, delivery to be made several months in the future. Also, members of the canning industry on the Pacific Coast had contracts to purchase corn sugar for delivery in more than thirty days.

If shortages appeared, however, it sold futures only as it bought spot corn for grinding.[5]   In this manner it reached a balanced position with reference to any increase in spot corn prices.   It made no effort to protect itself against a decline in prices.

In 1940 it netted a profit of $680,587.39 in corn futures, but in 1942 it suffered a loss of $109,969.38.   In computing its tax liability Corn Products reported these figures as ordinary profit and loss from its manufacturing operations for the respective years.   It now contends that its futures were "capital assets" under § 117 and that gains and losses therefrom should have been treated as arising from the sale of a capital asset.[6]   In support of this position it claims that its futures trading was separate and apart from its manufacturing operations and that in its futures transactions it was acting as a "legitimate capitalist."   *United States* v. *New York Coffee & Sugar Exchange,* 263 U. S. 611, 619.   It denies that its futures transactions were "hedges" or "speculative" dealings as

---

[5] The dispositions of the corn futures during the period in dispute were as follows:

|  | *Sales of futures thousand bushels* | *Delivery under futures thousand bushels* |
| --- | --- | --- |
| 1938 | 17,400 | 4,975 |
| 1939 | 14,180 | 2,865 |
| 1940 | 14,595 | 250 |
| 1941 | 2,545 | 2,175 |
| 1942 | 5,695 | 4,460 |

[6] "(1) CAPITAL ASSETS.—The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1) ; . . . ."

covered by the ruling of General Counsel's Memorandum 17322, XV–2 Cum. Bull. 151, and claims that it is in truth "the forgotten man" of that administrative interpretation.

Both the Tax Court and the Court of Appeals found petitioner's futures transactions to be an integral part of its business designed to protect its manufacturing operations against a price increase in its principal raw material and to assure a ready supply for future manufacturing requirements. Corn Products does not level a direct attack on these two-court findings but insists that its futures were "property" entitled to capital-asset treatment under § 117 and as such were distinct from its manufacturing business. We cannot agree.

We find nothing in this record to support the contention that Corn Products' futures activity was separate and apart from its manufacturing operation. On the contrary, it appears that the transactions were vitally important to the company's business as a form of insurance against increases in the price of raw corn. Not only were the purchases initiated for just this reason, but the petitioner's sales policy, selling in the future at a fixed price or less, continued to leave it exceedingly vulnerable to rises in the price of corn. Further, the purchase of corn futures assured the company a source of supply which was admittedly cheaper than constructing additional storage facilities for raw corn. Under these facts it is difficult to imagine a program more closely geared to a company's manufacturing enterprise or more important to its successful operation.

Likewise the claim of Corn Products that it was dealing in the market as a "legitimate capitalist" lacks support in the record. There can be no quarrel with a manufacturer's desire to protect itself against increasing costs of raw materials. Transactions which provide such protection are considered a legitimate form of insurance. *United States* v. *New York Coffee & Sugar Exchange,* 263

U. S., at 619; *Browne* v. *Thorn,* 260 U. S. 137, 139–140. However, in labeling its activity as that of a "legitimate capitalist" exercising "good judgment" in the futures market, petitioner ignores the testimony of its own officers that in entering that market the company was "trying to protect a part of [its] manufacturing costs"; that its entry was not for the purpose of "speculating and buying and selling corn futures" but to fill an actual "need for the quantity of corn [bought] . . . in order to cover . . . what [products] we expected to market over a period of fifteen or eighteen months." It matters not whether the label be that of "legitimate capitalist" or "speculator"; this is not the talk of the capital investor but of the far-sighted manufacturer. For tax purposes petitioner's purchases have been found to "constitute an integral part of its manufacturing business" by both the Tax Court and the Court of Appeals, and on essentially factual questions the findings of two courts should not ordinarily be disturbed. *Comstock* v. *Group of Investors,* 335 U. S. 211, 214.

Petitioner also makes much of the conclusion by both the Tax Court and the Court of Appeals that its transactions did not constitute "true hedging." It is true that Corn Products did not secure complete protection from its market operations. Under its sales policy petitioner could not guard against a fall in prices. It is clear, however, that petitioner feared the possibility of a price rise more than that of a price decline. It therefore purchased partial insurance against its principal risk, and hoped to retain sufficient flexibility to avoid serious losses on a declining market.

Nor can we find support for petitioner's contention that hedging is not within the exclusions of § 117 (a). Admittedly, petitioner's corn futures do not come within the literal language of the exclusions set out in that section. They were not stock in trade, actual inventory,

property held for sale to customers or depreciable property used in a trade or business. But the capital-asset provision of § 117 must not be so broadly applied as to defeat rather than further the purpose of Congress. *Burnet* v. *Harmel,* 287 U. S. 103, 108. Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by § 117 applies to transactions in property which are not the normal source of business income. It was intended "to relieve the taxpayer from . . . excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions." *Burnet* v. *Harmel,* 287 U. S., at 106. Since this section is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly. This is necessary to effectuate the basic congressional purpose. This Court has always construed narrowly the term "capital assets" in § 117. See *Hort* v. *Commissioner,* 313 U. S. 28, 31; *Kieselbach* v. *Commissioner,* 317 U. S. 399, 403.

The problem of the appropriate tax treatment of hedging transactions first arose under the 1934 Tax Code revision.[7] Thereafter the Treasury issued G. C. M. 17322, *supra,* distinguishing speculative transactions in commodity futures from hedging transactions. It held that hedging transactions were essentially to be regarded as insurance rather than a dealing in capital assets and that

---

[7] Section 208 (8) of the Revenue Act of 1924 limited "capital assets" to property held more than two years. This definition was retained until the Act of 1934. Since the rules of the various commodity exchanges required that futures contracts be closed out in periods shorter than two years, these contracts could not qualify as capital assets.

gains and losses therefrom were ordinary business gains and losses. The interpretation outlined in this memorandum has been consistently followed by the courts as well as by the Commissioner.[8] While it is true that this Court has not passed on its validity, it has been well recognized for 20 years; and Congress has made no change in it though the Code has been re-enacted on three subsequent occasions. This bespeaks congressional approval. *Helvering* v. *Winmill,* 305 U. S. 79, 83. Furthermore, Congress has since specifically recognized the hedging exception here under consideration in the short-sale rule of § 1233 (a) of the 1954 Code.[9]

We believe that the statute clearly refutes the contention of Corn Products. Moreover, it is significant to note that practical considerations lead to the same conclusion. To hold otherwise would permit those engaged in hedging transactions to transmute ordinary income into capital

---

[8] *Stewart Silk Corp.* v. *Commissioner,* 9 T. C. 174; *Battelle* v. *Commissioner,* 47 B. T. A. 117; *Grote* v. *Commissioner,* 41 B. T. A. 247. See *Estate of Makransky* v. *Commissioner,* 5 T. C. 397, 412, aff'd *per curiam,* 154 F. 2d 59; *Trenton Cotton Oil Co.* v. *Commissioner,* 147 F. 2d 33, 35; *Commissioner* v. *Farmers & Ginners Cotton Oil Co.,* 120 F. 2d 772, 774; *Tennessee Egg Co.* v. *Commissioner,* 47 B. T. A. 558, 560; G. C. M. 18383, 1937–2 Cum. Bull. 244, 245; I. T. 3137, 1937–2 Cum. Bull. 164, 166. Cf. *Commissioner* v. *Banfield,* 122 F. 2d 1017, 1019–1020; G. C. M. 18658, 1937–2 Cum. Bull. 77.

[9] Section 1233 (a) provides that gain or loss from "the short sale of property, other than a hedging transaction in commodity futures," shall be treated as gain or loss from the sale of a capital asset to the extent "that the property, including a commodity future, used to close the short sale constitutes a capital asset in the hands of a tax-payer." The legislative history recognizes explicitly the hedging exception. H. R. Rep. No. 1337, 83d Cong., 2d Sess., p. A278; S. Rep. No. 1622, 83d Cong., 2d Sess., p. 437: "Under existing law bona fide hedging transactions do not result in capital gains or losses. This result is based upon case law and regulations. To continue this result hedging transactions in commodity futures have been specifically excepted from the operation of this subsection."

gain at will. The hedger may either sell the future and purchase in the spot market or take delivery under the future contract itself. But if a sale of the future created a capital transaction while delivery of the commodity under the same future did not, a loophole in the statute would be created and the purpose of Congress frustrated.

The judgment is

*Affirmed.*

MR. JUSTICE HARLAN took no part in the consideration or decision of this case.