**DELTIDE FISHING & RENTAL TOOLS, INC.**

v.

**UNITED STATES of America.**

**Civ. A. No. 14980.**

United States District Court
E. D. Louisiana,
New Orleans Division.

Jan. 15, 1968.

H. Paul Simon, John A. Stassi, II, Deutsch, Kerrigan & Stiles, New Orleans, La., for plaintiff.

Louis C. LaCour, U. S. Atty., Gene S. Palmisano, Ernest M. Morial, Asst. U. S. Attys., New Orleans, La., Ben Douglas, Tax Division, U. S. Dept. of Justice, Washington, D. C., for defendant.

HEEBE, District Judge.

I.

After paying all of the internal revenue taxes assessed against it, plaintiff-taxpayer filed this action on October 7, 1964, claiming that overpayments were made because of "illegally and erroneously assessed" taxes for its taxable years ending in February of the years 1955, 1956, 1957, 1958, 1959 and 1960. Although the plaintiff's original complaint alleged a number of different errors in the assessment and collection of its taxes, it was stipulated between the parties in a document filed in the record on July 19, 1966, that

"The only question remaining in controversy in this action is whether the gain realized by plaintiff on dispositions of its depreciable rental tools, in each of the taxable years here involved, constituted gain eligible (under § 1231 of the Internal Revenue Code of 1954) for long-term capital-gain treatment, or whether such gain constituted ordinary income."

In the same document the parties stipulated that plaintiff had filed timely its income tax returns for the taxable years involved and had paid the taxes assessed by the District Director thereon; that the District Director subsequently examined plaintiff's income tax returns and timely assessed and collected from the plaintiff additional amounts of tax and interest for the taxable years involved; that with respect to the taxes paid for the taxable years involved, the plaintiff filed timely with the District Director its claims for refund and the District Director properly notified plaintiff of the disallowance of its claims; that this suit was then instituted timely.

The plaintiff, in each of the taxable years in question, was engaged in the business of renting special tools to oil well operators and drilling contractors. Under the rental agreements, plaintiff reserved and retained title to all the "fishing" tools which it rented, but the parties did agree that any tools lost or damaged by the lessees would be charged to the lessees at slightly more than the full original cost of the tools. In the taxable years involved, the plaintiff realized, from the charges paid by lessees for lost and irreparably damaged tools, gains in excess of the adjusted basis of the tools in the amounts of $17,915.04, $24,054.81, $65,237.01, $107,309.25, $44,129.04, and $47,730.51, respectively. (Count 6 of the Stipulation of July 19, 1966) The Internal Revenue Service taxed those gains as ordinary income; the plaintiff, however, contends that these gains should be treated as capital gains and taxed at the preferred rate. The parties have stipulated the amounts of the refund of tax as well as assessed interest which will be due plaintiff if the Court finds that the gains involved should have been treated as capital gains rather than ordinary income. The nature of the plaintiff's business and of its contracts with its lessees is more fully described in the defendant's brief, pages 3–7:

"Plaintiff is a Louisiana corporation engaged in the business of supplying tools to operators in the oil and gas industry. Plaintiff's equipment is functionally specialized in nature, and is designed for use in coping with various problems that are encountered in the course of oil and gas drilling operations. In some instances plaintiff supplies tools, pipe, and specially trained workers to operators of wells who have encountered operating difficulties in the drilling process. A typical example of plaintiff's function involves the careless oil rig worker who drops a wrench or similar tool down the hole being drilled, thereby interrupting operations. Plaintiff is called upon to supply both the tools and the expertise necessary to remove that impediment so that normal operations can be resumed. A trained workman must necessarily be supplied along with the needed equipment because the ordinary worker on an oil or gas rig does not have the training necessary to conduct the recovery or fishing operation or to use the equipment supplied. Where a trained worker is sent out with the equipment, he takes charge of the rig and remains in charge during the course of the fishing operation. In other instances, plaintiff supplies tools alone to operators of wells who need them, but who are not experiencing operating difficulties or are familiar with the operation of the tool and therefore do not need the services of plaintiff's specially trained workmen. Plaintiff's business thus has two aspects, fishing tools and rental tools. *In both aspects of the business, it is plaintiff's policy to rent the tools to the operators rather than sell them.* This procedure is presumably tolerated by the lessees because plaintiff's specialized tools are designed to cope with *ad hoc* operating difficulties which are not always encountered during the course of drilling operations. It would be too expensive for the operator to invest extensively in tools which he might not need.

"The tools are rented out at rates fixed by a rental schedule. The rate of rental on a particular tool is not affected by whether a trained worker is sent out with the tool; compensation to the plaintiff for supplying his services is handled in a different fashion. *Plaintiff's tool rental contracts contain a standard provision that obligates the lessee to pay the repair cost for damage to any tools and to pay the full replacement cost of any tools lost or irreparably damaged while under lease.* No amount is fixed in the contract; plaintiff determines the replacement cost of the tool, customarily adds on 10% above cost,[1] and bills that amount to the lessee. A lessee must pay

[1.] The plaintiff asserts that the 10% surcharge above cost represents "the excess of replacement cost over plaintiff's orig- inal cost due to the general rise in the market price of the replacement tools during the time since plaintiff's acquisi-

the rental due on the tool even though it is lost or damaged, in addition to paying for its replacement cost. During [the years in question] the total number of invoices issued by plaintiff in billing customers for lost or damaged tools, on which the tool rental had been previously paid, constituted approximately 18% of the total number of invoices issued by plaintiff covering both rental of tools and lost or damaged tools. During those same years, plaintiff's income attributable to lost and damaged tools was approximately 18.5% of its income attributable to tool rentals. Loss or damage to tools and equipment leased by plaintiff recurred with frequency and regularity, and income received from the disposition of lost or damaged tools constituted a substantial portion of plaintiff's total income from its business." (emphasis supplied)

It is clear then, that the plaintiff is in the business of renting, not selling, special oil well tools, and that the plaintiff has never disposed of any of its rental tools except when they have been lost or irreparably damaged by the lessees.

## II.

The only question involved, according to the stipulation of the parties and the undisputed facts, is whether or not the gains realized by the taxpayer from the charges assessed against its lessees for lost and irreparably damaged tools should receive capital gains treatment. Moreover, the parties have stipulated that all but one of the requirements for capital-gains treatment have been met by plaintiff with respect to the gains in question; the sole issue remaining revolves about the requirement that the tools involved be "capital assets." That issue must be decided with reference to §§ 1221 and 1231 of the Internal Revenue Code. These sections are contained in subchapter P of the Code, entitled "Capital Gains and Losses." Subchapter P is divided into four parts. Section 1221 appears in Part 3 which is entitled "General Rules for Determining Capital Gains and Losses." Section 1221 states in pertinent part as follows:

"For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

"(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

"(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business."

Obviously, if § 1221 were the only provision pertinent in this case, the decision would have to be for the defendant, and capital gains treatment denied, because the fishing tools in question, although "property held by the taxpayer" as required by the general clause of § 1221, come specifically within the second exception contained in § 1221 quoted above; it is not disputed that the tools involved in this suit were subject to the allowance for depreciation provided in § 167 of the Code.

The taxpayer, however, relies on § 1231. That section is contained in Part 4 of subchapter P entitled "Special Rules for Determining Capital Gains and Losses." Section 1231 is entitled "Property Used in the Trade or Business and Invol-

---

tion of the lost or irreparably damaged tools being replaced." (Plaintiff's brief, p. 3) The government's brief does not dwell on the significance of the 10% surcharge and the government seems to accept plaintiff's explanation. An identical surcharge was made by the taxpayer in Fishing Tools, Inc. v. Usry; the Court, Solomon J., stated, "Plaintiff's charge of ten (10) per cent over cost is insignificant. This additional charge is hardly sufficient to cover administrative costs." 232 F.Supp. 400, 402 (E.D.La.1964)

untary Conversions," and reads in pertinent part as follows:

"(a) General Rule.—If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets.

\*   \*   \*   \*   \*   \*

"(b) Definition of property used in the trade or business.—For the purposes of this section \* \* \* [t]he term 'property used in the trade or business' means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, \* \* \* which is not—

"(A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year,

"(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."

In its original brief, the defendant relied heavily on the so-called "*Corn Products* doctrine" enunciated in the case of Corn Products Refining Co. v. Commissioner of Internal Revenue, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955). However, the Court, by minute entry dated April 28, 1967, indicated its great reluctance to apply the *Corn Products* doctrine to the facts of this case, but indicated that a theory analogous to the *Corn Products* doctrine might be applied in interpreting and limiting the liberal terms of § 1231's definition of "Property Used in the Trade or Business." The Court then reset the case for oral argument for further discussion by counsel for both sides on this difficult problem. At the oral argument, and in its supplemental brief submitted thereafter, the defendant bolstered its contentions with respect to the *Corn Products* doctrine and also attempted to make the analogy suggested by the Court by relating the *Corn Products* theory to the terms of § 1231. The Court is well aware, certainly, of the difficulty involved in deciding these issues; and we are especially appreciative of the efforts of counsel on both sides to apprise the Court of the law and theory necessary to a proper consideration of the case. Now, after a thorough consideration of all the facts stipulated between the parties, and of all the arguments submitted by counsel at oral argument and in supplemental briefs, it is the opinion of the Court that the taxpayer-plaintiff is entitled to capital gains treatment with respect to the gains made from the charges for the loss of and irreparable damage to its rental tools.[2]

### III.

The government contended that, separate and apart from the express provi-

2. In reaching our determination we are comforted by two reported cases dealing with essentially identical facts, involving businesses leasing "fishing tools," in which capital-gains treatment was afforded the taxpayer: Fishing Tools, Inc. v. Usry, 232 F.Supp. 400 (E.D.La.1964), and Grant Oil Tool Co. v. United States, 381 F.2d 389 (Ct.Cl.1967). The first opinion was rendered by Judge Solomon while sitting as a visiting judge in this district. An unreported decision involving "fishing tools" cited by plaintiff resulted in a jury verdict in favor of the taxpayer, Houston Oil Field Material Co., Inc. v. United States, Western District of Texas, Austin Division, 1956, C.A. 839. None of these decisions dwelt at any length on the applicability of the *Corn Products* theory to § 1231.

sions of § 1231, the tools in question were not "capital assets" as that concept has been refined by the *Corn Products* case and therefore not entitled to capital gains treatment upon disposition, regardless of the language of § 1231. Alternatively, the government contended that the tools do not come within the scope of the express terms of § 1231.

We reject the first contention for, among other considerations, the reasons which we sketched briefly in our previous minute entry. In Corn Products Refining Co. v. Commissioner of Internal Revenue, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955), the Supreme Court held that certain corn futures, although not within any of the exceptions to the general definition of "capital assets" in § 1221, were not to be considered "capital assets" under that section. The Court held that, despite the fact that § 1221 was drafted by the use of specific exceptions engrafted on the broadest possible definition ("property held by the taxpayer"), Congress had a definite and limited idea in mind as to what "capital assets" were to be and that the Congressional conception of the "capital asset" concept would take the futures involved out of the category of "capital assets" even though none of the exclusionary clauses of § 1221 specifically covered them. The Court stated:

"Admittedly, petitioner's corn futures do not come within the literal language of the exclusions set out in that section. They were not stock in trade, actual inventory, property held for sale to customers or depreciable property used in a trade or business. But the capital-asset provision of § 117 [the 1939 Code's forerunner of § 1221 of the 1954 Code] must not be so broadly applied as to defeat rather than further the purpose of Congress. * * * Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by § 117 applies to transactions in property which are not the normal source of business income. It was intended 'to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions.' Burnet v. Harmel [287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199] * * *." 350 U.S. at 51–52, 76 S.Ct. at 24.

The government's reliance on *Corn Products* is confusing from the beginning, for, unlike the property involved in the *Corn Products* case, the tools in question here are excluded from the definition of "capital assets" by the express language of § 1221 itself. Here, there is simply no necessity for the application of the *Corn Products* doctrine, since the express language of § 1221(2) excludes these tools from the capital-asset definition. The tools in question, by the express terms of § 1221, are not capital assets in the first place.

We must reject the government's contention that the *Corn Products* case operates to exclude these tools, admittedly not capital assets under the express definition of that term in § 1221, from coverage under the provisions of § 1231. Section 1231 refers to the very class of property excluded from the definition of capital-asset by § 1221(2) and, with certain qualifications, allows gains from sales or involuntary conversions of such property to be *treated*, or, to use the exact language of the statute, "*considered as gains* * * * from sales or exchanges of capital assets. * * *" § 1231(a) (emphasis added). We indicated in our previous minute entry that we would have great difficulty in applying the *Corn Products* doctrine to exclude the tools in question here from the capital-asset treatment granted by § 1231 for the reason that, through § 1231, "Congress has said, in effect, that even though property used in the trade or business is not a capital asset, we are to treat it as a capital asset." We adhere strongly to our previous statement. Taking the government's argument on its face, and holding that the tools in question

are not "capital assets" under the *Corn Products* doctrine (an unnecessary reliance on *Corn Products,* since the very language of § 1221 excludes the tools from the definition), we would still have to deal with a statute which grants "capital-gains *treatment*" to dispositions of properties which are expressly posited by the statute *not* to be "capital assets."

Although there is some authority for the application of the *Corn Products* doctrine to § 1231 assets,[3] we refrain from interpreting that authority liberally to cover the facts of this case. In Commissioner of Internal Revenue v. Gillette Motor Transportation, Inc., 364 U.S. 130, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1960), the Supreme Court, through Mr. Justice Harlan, stated:

> "Since the net effect of the [pertinent part of § 1231] is merely to remove one of the exclusions made to the definition of capital assets in § [1221], it seems evident that 'property used in the trade or business,' to be eligible for capital-gains treatment, must satisfy the same general criteria as govern the definition of capital assets." 364 U.S. at 134, 80 S.Ct. at 1500.

Despite the apparently general wording of *Gillette,* as we read the case, it turned on the Court's feeling that the right to the *use* of the taxpayer's facilities was not itself "property" (whether used in the taxpayer's trade or business, or otherwise), see 364 U.S. 136, 80 S.Ct. 1497.[4] Thus, to some extent, the statement quoted above, although valid as applied to the facts of the *Gillette* case, might not be valid as applied to the facts of this case. In *Gillette,* the Court, in essence, held that "property" was not involved. Here there is no question but that we are talking about "property." Our view of the net effect of §§ 1221 and 1231 is not that § 1231 merely removes one of the exclusions made to the definition of capital assets; rather, § 1221 sets up an exclusion to capital assets, and then § 1231 does not merely erase that exclusion, but says that as to those excluded items gains will be treated as gains from capital items. Congress has thus said, in effect, that even though property used in the trade or business is not a capital asset, we are to treat it as a capital asset. In so doing, Congress may well have established a *fence of immunity* from the *Corn Products* doctrine around "property used in the trade or business": the *Corn Products* doctrine permits the courts to carve out nonstatutory exceptions to the definition of capital asset; but Congress has said that where property used in the trade or business is concerned, it will be treated as a capital asset even though it is not a capital asset. To these difficulties *Gillette* offers no real and specific answers. *Gillette* certainly reads § 1231's term "property used in the trade or business" to share basic aspects of § 1221's "capital-asset" concept. But how extensive the common ground of the two terms is in the Court's view is not delineated by *Gillette* beyond the holding that both terms allude to "property" in some real and definite way. We are not prepared to enlarge the scope of *Gillette,* in the circumstances of this case, for we would not merely be carving out a judicial exception to § 1221 to run along with some Congressional exceptions, we would be running directly counter to Congressional instructions.

Moreover, *Gillette* was concerned with § 117(j) of the 1939 Code. That section,

---

3. Despite peripheral allusions to the problem in several cases and articles, see e. g., E. I. du Pont de Nemours & Co. v. United States, 288 F.2d 904, 909, 153 Ct.Cl. 274 (1961); Philadelphia Quartz Co. v. United States, 374 F.2d 512, 515 (Ct.Cl.1967); Grant Oil Tool Co. v. United States, 381 F.2d 389, 398 (Ct.Cl. 1967); Wilson, Tax Dismay and the Disposal of Rental Personalty, 40 Taxes 805, 808, n. 21 (1962), and some apparently important language on the issue by the Supreme Court in Commissioner of Internal Revenue v. Gillette Motor Transportation, Inc., 364 U.S. 130, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1960), discussed infra, nowhere does there appear any definitive confrontation of the question.

4. And see Mertens, Law of Income Taxation, § 22.12, pp. 59–60.

the forerunner of the present § 1231, was but one subpart of the 1939 Code's comprehensive treatment of capital gains concepts embodied in the single § 117. Although § 1231 is substantially the embodiment of the former § 117(j), we deem it of some weight that, in the 1954 Code, Congress has separated the provisions of the former § 117 into several headings; the § 1221 definition of capital asset is now set forth under the heading *"General* Rules for Determining Capital Gains and Losses," whereas § 1231 has been placed under the heading *"Special* Rules for Determining Capital Gains and Losses." The separate titles serve to emphasize the Congressional intent that the nature of an asset in relation to the Congressional concept of "capital asset" is simply not relevant to a determination of whether the asset is to come within the *"special"* treatment accorded by Congress under § 1231. For all of these reasons, we would limit the *Gillette* case, despite what seem to be its broad implications, to its own special circumstances.

### IV.

We do not reach the question whether, if a general concept of capital-asset as outlined in *Corn Products* were applicable to all capital-gains sections, including § 1231, this taxpayer's rental tools would in fact come within that concept. Although we are aware of general statements in some of the cases seemingly supporting a negative conclusion, we might well be inclined to answer such a question in the affirmative in the circumstances of this case.

The government has stressed language in *Corn Products* to the effect that "profits and losses arising from the everyday operation of a business be considered as ordinary income or loss" and that capital-gains treatment applies only to "transactions in property which are not the normal source of business income." 350 U.S. at 52, 76 S.Ct. at 24. The stress placed on this language by the government should not obscure the difficult nature of the problems involved in pinpointing the judicial concept of "capital-asset." The *Corn Products* case itself

states, immediately following the phrases quoted by the government, that the capital-gains provisions were "intended 'to relieve the taxpayer from * * * *excessive tax burdens on gains resulting from a conversion of capital investments,* and to remove the deterrent effects of those burdens on such conversions." (emphasis added)

Professor Surrey has stated that § 1221(1) and (2), and the *Corn Products* decision, should be interpreted as a primary tendency of Congress and the Court to distinguish between "investment" and "business" property as the basis for the definition of the capital-asset concept. Surrey, Definitional Problems in Capital Gains Taxation, 69 Harv.L.Rev. 985, 1015. This correct approach should not be abused, however, so as to preclude capital-gains treatment with respect to *investment* property held by a *business.* Surrey in fact considers § 1221(2) and § 1231 together as a unified attempt by Congress to treat "investment property" of a business (or, "assets of an admitted business activity which are other than inventory, such as the building and land on which the business is conducted or the machinery used in the business operations") as "a capital asset for gain purposes but not a capital asset for loss purposes." 69 Harv.L.Rev. at 996–997.

A strong case might be made that the capital asset concept would include all investment property of a business, as distinguished from property held for sale (or directly related to the inventory property) which is the direct source of normal business income. See Mertens, Law of Income Taxation, § 22.11, p. 56. To put the matter in proper perspective, the further distinction ought to be made between the asset *per se,* and its conversion; the nature of the *normal disposition of the asset* is, after all, what really determines the nature of the asset as "capital" or not. The case might then be better put: that the capital-asset concept would exclude all property, the *disposition* (or conversion) of which is (or is analogous to) the direct source of normal business income. And further,

perhaps the precise question ought not to be whether a conversion of an asset (particularly where the conversion is an involuntary one) is part of the *total* regular business process, but whether such conversions are an integral part of the particular process of producing the normal income of the business. *Corn Products* might make more sense if its statement that "profits and losses arising from the everyday operation of a business be considered as ordinary income or loss," is recognized as stressing properly that activity of the business which normally directly produces business income. The government here seems to argue that gains resulting from replacement of business property, as long as that property is in any way useful or "integral" to the *total business operation,* are ordinary gains. In our opinion, such a view is too strict to be consistent with the aspect of capital assets as investment property. All businesses, other than those perhaps which deal in "pure" service, *necessarily hold and convert property* invested in the business. And all such investment property of a business contributes ultimately to the success of the business, and the ultimate garner-

ing of profits. But the mere fact that investment property of a business is an "integral" part of the total business process certainly does not require that gains from the disposition of such property be treated as "ordinary" gains where the disposition of the property is not necessary to the essence of the revenue-producing process.[5]

The government has apparently contested capital-gains treatment in the case of many businesses such as this one, where the business consists solely of the rental of equipment, and the business investment consists primarily of the equipment rented. The loss of rental objects and the replacement of that investment property is so regular with such businesses that the government seems to have lost sight of the fact that without the replacement of the investment, the real business of rental could not be continued. The maintenance of reliable tools in good condition is as necessary to the rental business of this taxpayer as is the maintenance of, for example, trucks to a firm in the trucking industry, or ships to a shipping firm. Merely because replacement of its investment is necessitated on a more or less recurrent basis

5. This may be the unarticulated basis of many decisions which, while quoting the general language of *Corn Products*, have found business investment property not an integral part of the taxpayer's business. See, e. g., the cases cited in footnotes 2 and 3, supra. The Court of Claims has stated that "It may be that gain from the disposition of property used in the trade or business may be so *closely* allied to the *main sources of business income* that *Corn Products* may be properly applied. E. I. du Pont de Nemours & Co. v. United States, 288 F. 2d 904, 909, 153 Ct.Cl. 274 (1961) (emphasis supplied). However, it is not clear from the context in which the Court was speaking whether it was concerned with the *Corn Products* rule *per se* or only as applicable to § 1231 assets. The Court of Appeals, for the Tenth Circuit has closely approached the principles we suggest. In United States v. Hess, 341 F. 2d 444 (10th Cir. 1965), the Court stated the question to be whether or not the property concerned was "acquired not as an investment but to perpetuate and benefit

*the mainstream of the taxpayers' business income."* at 447. (emphasis supplied) However, this language was diluted by the Court's later statement that the effect of the *Corn Products* case "is to essentially broaden the [exclusionary] provisions of Section 1221 to include the sale of products purchased by the taxpayer, not as an investment, but as an integral and necessary act in *the conduct of his business."* Ibid. (emphasis supplied) The Court avoided the precise issue by reference to the binding effect of the jury's determination. In our view, the so-called "container cases" represent court determinations that, although the containers may be returned by customers in exchange for the remittance of deposits, fragile containers are essentially an element of the product sold, and that, as such, their return is not expected and the deposit received is, unless and until reclaimed, accrued regular income to the company. See Fishing Tools, Inc. v. Usry, 232 F.Supp. 400, 403 (E.D.La.1964).

should be no reason to deprive this taxpayer of the right, equal with other businesses, to replenish its investment at the preferred rate of taxation. *Corn Products* might well be distinguished from the present case in that the property there (corn futures) was not actually the taxpayer's investment in its total business operation so much as essentially identical to the raw material which, in the course of the company's normal business operations, was converted into its "saleable product," and was for that reason an integral part of *the revenue-producing process*. The sale of the futures by the taxpayer in the *Corn Products* case was *not* the sale of an investment, but the sale of what would, under ordinary circumstances, have been converted into the final saleable product; the revenue from the futures was the intended substitute for normal business income.[6] Here, it cannot be said that Deltide's sale of its fishing tools was a substitute for its rental income. In the present case, it might be said that the *use* of the rental tools was the "ordinary asset" which was the source of the taxpayer's ordinary income, the rental for the tools; whereas the tools themselves, apart from their use, were to this taxpayer a strict investment in its business and not the intended source of business revenue at all. Such a dichotomy was, in fact, the

basis for the Supreme Court's finding in the *Gillette* case, supra, that the "use" of the taxpayer's investment property was not a "capital asset," although (presumably) the investment property itself would have been considered a capital asset.

## V.

The government's alternate argument is that the tools involved here do not meet the test of the express terms of § 1231. The government does not contend that the tools do not come within § 1231's express general definition of property used in the trade or business, apparently conceding that the tools are "property," are "used in the trade or business" of the plaintiff, have been "held for more than 6 months" and are "subject to the allowance for depreciation provided in § 167." The government's chief argument is that the tools come within the second exception to § 1231's general definition in that they are "property held by the taxpayer primarily for sale to customers in the ordinary course of [the plaintiff's] trade or business."[7]

The contention that the taxpayer's tools were "held primarily for sale to customers in the ordinary course of [the taxpayer's] trade or business," although in a sense supported by the frequency of the dispositions and the fact

---

6. This view of *Corn Products* is borne out by a careful reading of the case and a proper view of the precise facts with which the Court was confronted. The Court specifically stated that the taxpayer, in entering the market of corn futures, "was 'trying to protect a part of [its] manufacturing costs'; that its entry was not for the purpose of 'speculating and buying and selling corn futures' but *to fill an actual 'need for the quantity of corn [bought] * * * in order to cover * * * what [products]* we expected to market over a period of fifteen or eighteen months.' * * * For tax purposes petitioner's purchases have been found to 'constitute an integral part of its manufacturing business' by both the Tax Court and the Court of Appeals * * *."* 350 U.S. at 51, 76 S.Ct. at 23. (emphasis supplied) Again, the Court supported its holding with the statement that, "To hold otherwise would permit

those engaged in hedging transactions to *transmute ordinary income into capital gain at will*. The hedger may either sell the future and purchase in the spot market or take delivery under the future contract itself. But if a sale of the future created a capital transaction while delivery of the commodity under the same future did not, a loophole in the statute would be created and the purpose of Congress frustrated." 350 U.S. at 53–54, 76 S.Ct. at 25. (Emphasis supplied).

7. The government also attempts an argument that the first exception in § 1231 would apply also, but this we reject summarily, chiefly relying on the well-reasoned and -documented opinion of the Court of Claims on this issue in the recent case of Grant Oil Tool Co. v. United States, 381 F.2d 389, 397–398 (1967).

that the loss and consequent conversion of the tools was thus in a real sense an "ordinary" part of the taxpayer's business situation, must nonetheless be rejected. The success of the contention rests essentially on the hope that this Court will read out of the phrase the all-important word "primarily." But merely because dispositions of assets may be "*ordinary*" does not mean that the assets are held "*primarily*" for that purpose. We hold that the term "primarily" does not merely repeat the sense conveyed by the word "ordinary," that "primarily" *adds somthing* to § 1231 which cannot be avoided without disregarding the plain meaning of the words and the Congressional intent.

"Primarily" means simply "of first importance," "principally." Malat v. Riddell, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966); Municipal Bond Corp. v. C. I. R., 341 F.2d 683 (8th Cir. 1965). In terms of numbers, primarily means a majority, a numerical plurality. Even accepting for purposes of argument the defendant's suggestion that tools held for rental purposes which may be expected to be "involuntarily converted" on a regular basis must be considered "held for sale," the presence of "primarily" in § 1231 would make difficult a resolution of that section's application to involuntary conversions of rental tools where anything less than 50% of tool rentals resulted in lost or irreparably damaged tools. Certainly, in this case, where invoices for lost tools, according to the government's own statement of the facts, accounted for less than "18% of the total number of invoices issued by plaintiff covering *both* rental of tools *and* lost or damaged tools," (emphasis added), defendant's brief p. 6, the fact is clear: the tools were not held "primarily" "for involuntary conversion" or "for sale." We do not reach the question of the taxpayer's contention, but it too is beyond dispute, that far from holding the tools in question "primarily for sale" the company did not in fact "hold" any tools "for sale" at all, but only charged lessees for their loss and damage. We are not prepared to say that, merely because the plaintiff provided for and insured itself against loss of its investment property so that it did not suffer from the conversion of its tools, the conversion was any less "involuntary." And where the only expectation of disposing of an investment item is its involuntary conversion, even though the taxpayer anticipates such dispositions and has provided for reimbursement, that item cannot be considered "*held* for sale." Here, as in *Grant Oil Tool Co. v. United States,* "instead of contracting with a private insurer, plaintiff, through the levy of the lost-in-hole charge, had the drilling contractors substitute for an insurer of its bodies." 381 F.2d 389, 396 (Ct.Cl. 1967). As was the case in *Grant Oil Tool,* although the losses are "remunerative to plaintiff, to the extent that the charge for such losses is the same as the selling price of similar new bodies * * * while more often than not, the lost bodies have been fully or partially depreciated on the plaintiff's books, * * * most, if not all, of the lost-in-hole charge is used to cover the cost of producing a new tool body and the general and administrative expenses * * * connected with such production," 381 F.2d at 396. In the facts of this case, defendant stated that "plaintiff's tool rental contracts contain a standard provision that obligates the lessee to pay the repair cost for damage to any tools and to pay *the full replacement* cost of any tools lost or irreparably damaged while under lease. * * * No amount is fixed in the contract; plaintiff determines the replacement cost of the tool, customarily adds 10% above cost, and bills that amount to the lessee." Defendant's brief pp. 5–6. (emphasis added)

Finally, after giving serious consideration to the theory, adopted by the government, which we advanced in our minute entry of April 28, 1967, that the *Corn Products* case might be applied by way of analogy to modify the strict terms of § 1231(b)(1)'s definition of "property used in the trade or business," we conclude that it must be

rejected. Our original thought was that the *Corn Products* case did not apply to § 1231; while reserving that question for further argument, we went on to suggest that

"The United States could change the thrust of its argument by directing it at § 1231(b) (1) (A) and (B), arguing that even though this property would not ordinarily be includible in inventory and is not held primarily for sale to customers in the ordinary course of trade or business, its involuntary conversion is so frequent, and so much a part of the regular course of the plaintiff's business, that we should consider it to be so much like property listed in § 1231(b) (1) (A) and (B) that it should be excluded for that reason,"

just as the *Corn Products* case would exclude from the definition of capital asset in § 1221 certain assets which, although not specifically excluded from the general definition by any express exception in § 1221, are so much *like* the property described in the express exceptions that they should be excluded.

The strict view which we now take with regard to § 1231 precludes the diluting effect of such an argument. If in fact, as we now hold, § 1231 is a "special" rule for determining capital gains and losses, to be interpreted strictly in accordance with its own express terms, then there is no room for the analogy which we previously suggested. It would seem that, although general concepts in the Code may be subject to modification of their express language by interpretations of Congressional intent, such special sections as 1231 ought to be recognized as attempts by Congress to "fence off" the areas they treat from such modification by the courts, and that taxpayers ought to be able to rely with confidence on the explicit provisions of such sections.

In accordance with the foregoing reasons, and pursuant to Count 7 of the stipulation of the parties filed herein on July 19, 1966, it is hereby adjudged and decreed that the plaintiff, Deltide Fish-

ing & Rental Tools, Inc., have judgment against the defendant, the United States of America, in the sum of $90,693.90 with interest thereon from the indicated dates of payment.