**INTERNATIONAL SHOE MACHINE CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 70–317–G.**

United States District Court,
D. Massachusetts.

July 30, 1973.

James D. St. Clair, Hale & Dorr, Evan Y. Semerjian, Boston, Mass., for plaintiff.

Donald R. Anderson, Asst. Chief, Refund Trial Section, Tax Div., Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OF DECISION

GARRITY, District Judge.

This is a tax refund suit in which the plaintiff taxpayer asserts that the Commissioner of Internal Revenue erroneously treated income realized from the plaintiff's sales of certain shoe machines as ordinary income instead of treating the income under the capital gains provisions of the Code. The court has jurisdiction under 28 U.S.C. §§ 1340, 1346(a)(1).

The plaintiff, a well-known manufacturer of shoe machinery, is a Massachusetts corporation with its principal place of business in Brighton, Massachusetts. During the years in question—1964 through 1966—the main source of its business income derived from the leases of its shoe machinery equipment to shoe manufacturers throughout the United States and abroad. During the years 1964, 1965 and 1966, plaintiff sold, respectively, 147, 69 and 55 shoe machines to customers who, at the time of the sales, had been leasing the machines for

at least six months. For the taxable years in question, plaintiff reported capital gains from these sales in the amounts of $437,374.32, $89,345.46 and $133,201.16. The Commissioner's response in each instance was to assess a deficiency, on the ground that the shoe machines in question were includable in plaintiff's inventory or were held for sale to customers in the ordinary course of business and that, in either event, the sales did not qualify under 26 U.S.C. § 1231 for capital gains treatment. The plaintiff paid deficiencies in the amounts of $107,895.97 for 1964, $20,549.48 for 1965, and $30,636.27 for 1966, with interest for all these years, and filed claims for refund, which were denied in all three cases. It then timely filed this action.[1] After trial and the filing of post-trial memoranda, a situation arose requiring the disqualification of the trial judge and the case was reassigned. The parties agreed to submit on the record, filed further memoranda and presented oral arguments.

Plaintiff contends that the income from the sales in question should be treated as capital gains under 26 U.S.C. § 1231, because the machines were not "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business," § 1231(b)(1)(B). Defendant agrees that the issue before the court concerns the applicability of this quoted subsection, and the parties thus assume that the sales in question conformed otherwise to the requirements of § 1231. They assume, in other words, that the machines were "used in the trade or business" and were "subject to the allowance for depreciation provided in section 167." Plaintiff has argued that the sales in question were extraordinary events because its policy has consistently been to lease, not sell, its shoe machines. Undoubtedly plaintiff's main interest was, during the years in question and earlier, that of leasing its shoe machines. Al-

though it sold new, non-leased machines to subsidiaries and affiliates in foreign countries and to a very few domestic companies, these sales, the income from which plaintiff reported as ordinary income, comprised approximately 15, 6 and 6 percent of total sales during the years involved here.

Until 1963 plaintiff's sales of machines to customers then leasing the machines consistently constituted less than 1% of plaintiff's gross revenues. Plaintiff's sales to its lease customers increased tenfold in 1963 over 1962 and more than thirtyfold in 1964 over 1962; revenue from such sales between 1964 and 1966 comprised, however, only 7, 2 and 2 percent of gross revenues. Of further importance are comparisons between lease and sales revenue during the tax years in question. The ratios of lease revenues to sales of leased machines during these years were 8, 40 and 30 to 1.

While sales of leased shoe machines did not, during the tax years in question, make up a large portion of plaintiff's business, they nonetheless increased sharply in those years over prior years. Plaintiffs attribute the increase to several factors. The investment tax credit, enacted in 1962, made it attractive for shoe manufacturers to buy shoe machinery rather than lease it. Customers were also aware of the decree entered against plaintiff's principal competitor in United States v. United Shoe Machinery Corporation, D.Mass.1953, 110 F.Supp. 295, aff'd per curiam, 1954, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910, which ordered United Shoe, inter alia, not to offer to lease its machines unless it also offered to sell them. Plaintiff attributes much significance to the fact that the interest in purchasing shoe machines, rather than leasing, originated with the customer. Plaintiff points out that it never developed a sales force, never solicited purchases, often attempted to dissuade customers from purchas-

---

1. The parties have settled a related suit, docket number C.A. 71–515–G, concerning a deduction for bad debt reserves. Judgment in that case will be entered for the plaintiff for $12,205.77 plus interest.

ing, set prices high to make purchasing unattractive, and persisted, even in the face of customers' demand, in its policy of leasing shoe machinery equipment.

While these facts are pertinent, they do not paint a complete picture. When customers expressed an interest in purchasing the machine that they were leasing, plaintiff did not simply say, "We do not sell our machines." Such a course of conduct would have been harmful to plaintiff's customer relations; not surprisingly, plaintiff did not engage in it. Paul Hirsch, plaintiff's Vice President of Sales during 1964 through 1966, testified that "if a customer asked us specifically and indicated a serious desire and wanted to talk about purchase, I mean we had no hesitation; we would tell him the price." Plaintiff adopted a policy of selling if the customer was persistent enough, and a concomitant policy of non-discrimination; as Mr. Hirsch put it, "[W]e were also aware of the fact that we have to treat everyone alike. We can't refuse to sell to some and sell to others." Plaintiff made these decisions when demand first started to increase rapidly and selling became, if not a common, at least an accepted aspect of plaintiff's business. According to Michael M. Becka, plaintiff's executive vice president and general manager, the determinations leading to these decisions included "the fact that we didn't want to lose the sale to [our] competition." After these decisions were made, it was no longer necessary for sales personnel to seek a decision from the highest level of management on each purchase request. The policy was simply to sell if the customer insisted on buying, despite the company's preferences. The customer did not have to threaten to sue plaintiff or to take his business elsewhere unless plaintiff sold. In order to maintain good relations, plaintiff agreed to sell when the customer leasing its machines evidenced a strong interest in purchasing. In a competitive market, plaintiff has no ultimate choice but to adopt these policies.

In plaintiff's view the evidence establishes that the machines leased to customers for more than six months and then sold to the lessees were held by plaintiff primarily for lease and not for sale and, moreover, that the machines were not held and sold in the ordinary course of business because the sales were extraordinary events. We shall first state why we disagree with the latter contention. As we have found, when the demand from plaintiff's customers to purchase machines then on lease began to increase, plaintiff made a policy decision to try to dissuade the customer, but to sell if the customer insisted. The fact that plaintiff did not have a sales force is not of any particular moment, because, first, the customers initiated the negotiations and thus no selling effort was required of the plaintiff and, second, personnel trained in the leasing of shoe machines could, and did, consummate the sales themselves. Moreover, the products involved were, of course, the very same products that plaintiff leased and thus could not be said to be unusual property necessitating the hiring of specially-trained sales personnel. Finally, while the income from the sales did not constitute a major portion of the plaintiff's business, the sales were certainly substantial in number, totalling 271 over the three-year period. From the point when plaintiff decided to sell its leased machines to customers who expressed a strong desire to buy them, the plaintiff operated a business in which selling was an accepted and predictable part of its business. Plaintiff has not suggested that the machines it sold differed in any way or were initially handled in any different manner from the rest of its machines, nor has it suggested that the proceeds of the sales were used in any different manner from the proceeds of the leases. On all the facts we conclude that the 271 machines were held, and sold, in the ordinary course of plaintiff's business. See S.E.C. Corp. v. United States, S.D.N.Y.1956, 140 F. Supp. 717.

In support of its contention that the machines in question were held by plaintiff "primarily" for lease, and not for sale, plaintiff invokes the Supreme Court's opinion in Malat v. Riddell, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102. In *Malat,* the taxpayer had participated in acquiring a parcel of land; the purpose of the venture was disputed by the parties; it was either to develop the land for rental purpose, to sell it, or perhaps merely to do whatever seemed most profitable in light of future events. When selling came to appear to be the most advantageous course, taxpayer sold. On those facts the lower court found, and the Court of Appeals agreed, that the primary purpose became one of selling, that the sale was not the liquidation of an investment, and that the income from the sale was thus ordinary income. In a brief opinion, the Supreme Court reversed and remanded for fresh findings of fact, giving its definition of "primarily" as "of first importance" or "principally." The Court expressly disapproved of lower court holdings in similar cases based on defining "primarily" to include "substantially." The Court added, "The purpose of the statutory provisions with which we deal is to differentiate between the 'profits and losses arising from the everyday operation of a business' on the one hand (Corn Products Co. v. Commissioner, 350 U.S. 46, 52 [76 S.Ct. 20, 100 L.Ed. 29]) and 'the realization of appreciation in value accrued over a substantial period of time' on the other. (Commissioner v. Gillette Motor Co., 364 U.S. 130, 134 [80 S.Ct. 1497, 1500, 4 L.Ed.2d 1617])" *Id.* at 572, 86 S.Ct. at 1032.

When applied to this case, the two key pronouncements by the Court in *Malat* —with respect to the word "primarily" and to the purpose of the phrase "held by the taxpayers primarily for sale in the ordinary course of his trade or business"—appear to lead to conflicting results. On the one hand, generally speaking the purpose of selling its shoe machines was not of first importance to plaintiff. But on the other, the income from plaintiff's questioned sales arose from the everyday operation of the business and did not represent liquidation of an investment.

In Corn Products Co. v. Commissioner, 1955, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29, the Supreme Court had occasion to discuss the broad policy factors underlying the capital gain provisions. There the taxpayer established a large position in corn futures in order to insure that it would have a supply of corn for use in its manufacturing operations. It sold or took delivery on the future contracts as it deemed expedient in light of the market supply. In upholding the lower court's conclusion that because the futures were bought as an integral part of the plaintiff's business operations, the futures were not capital assets, the Court asserted: "Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment . . . applies to transactions in property which are not the normal source of business income. It was intended 'to relieve the taxpayer from . . . excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions,' Burnet v. Harmel, 287 U.S. [103], at 106 [53 S.Ct. 74, at page 75, 77 L.Ed. 199]." 350 U.S. at 52, 76 S.Ct. at 24. Although plaintiff asserts that *Corn Products* involved the definition of capital asset under the predecessor to 26 U.S.C. § 1221, and did not involve construction of the phrase "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business," the plaintiff has minimized the significance of the Supreme Court's having specifically quoted from *Corn Products* in its *Malat* opinion, which did deal with that phrase, albeit in a § 1221 context.

Recognizing the impact on its case that application of the *Corn Products* principles would have, plaintiff contends that *Corn Products* should not be

applied to a case arising under § 1231 but should be restricted to § 1221 cases. We do not agree. In the first place, the general principles enumerated in *Corn Products* would be significant in any case where there is a question whether a business disposition of its products is to be accorded capital gain or ordinary income treatment. Secondly, the phrase in *Malat* that the Supreme Court construed, using *Corn Products* as one of its guides, is identical to the phrase in § 1231 which plaintiff invokes here. Sections 1221(1) and 1231(b)(1)(B) both exclude from capital gains treatment income realized from sales of "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business . . . . " Thirdly, the Court of Appeals for the Ninth Circuit, in Hollywood Baseball Assn. v. C.I.R., 9 Cir. 1970, 423 F.2d 494, held that *Corn Products* applies to § 1231 assets in an opinion analyzing a contrary holding in Deltide Fishing & Rental Tools v. United States, E.D.La. 1968, 279 F.Supp. 661.

One of the arguments advanced by plaintiff was apparently not presented to the court in the *Hollywood Baseball* case, namely, that after the *Corn Products* decision Congress enacted § 1245 in an effort to recoup losses in revenue due to capital gains treatment of certain sales of property on which taxpayers had taken depreciation deductions; and there would be no need for such a section if Congress had intended that the *Corn Products* decision apply to § 1231. See Note, 24 Vand.L.Rev. 181, 188 (1970). The difficulty with this argument lies in its premise that gains realized upon the sale of any and all property integrally related to the business will under the *Corn Products* case be treated as ordinary income. But the *Corn Products* decision should not be read so broadly. It would, for example, have no bearing on the sale of an oil drilling rig by an oil company, see R. E. Cushing v. Commissioner, 11 T.C.Mem.Dec. 396, or of logging equipment by a lumber company, see F. M. Converse v. Earle, 51–2

U.S.T.C. ¶ 9431. Assuming the other requirements in § 1231 were satisfied, *Corn Products* would not operate to exclude income from the sales of such property from capital gains treatment. Therefore the application of the general *Corn Products* principles outlined above, re-asserted in *Malat*, is not inconsistent with the intent of Congress in enacting § 1245.

■ Returning to § 1231(b)(1)(B), the question becomes whether the fact that plaintiff's leased machines were, generally speaking, not held by the taxpayer primarily for sale to customers precludes applicability of the rule of the *Corn Products* case. We believe that it does not. If the apparent inconsistency should be irreconcilable, we believe that cases such as Hollywood Baseball Assn. v. C.I.R., *supra*, Recordak Corporation v. United States, 1963, 325 F.2d 460, 163 Ct.Cl. 294, and Continental Can Co. v. United States, 1970, 422 F.2d 405, 190 Ct.Cl. 811, indicate that the statutory provision should yield or be ignored. We would prefer to eschew the type of elaborate rationale found in those decisions and rely upon the principle of statutory construction of revenue laws stated in the opinion in the *Malat* case at 571–572 of 383 U.S., at 1032 of 86 S.Ct., "Departure from a literal reading of statutory language may, on occasion, be indicated by relevant internal evidence of the statute itself and necessary in order to effect the legislative purpose."

■ We shall, however, make an effort at reconciliation. It seems to us that the plaintiff's general purpose of holding leased machines primarily for leasing them does not necessarily negate a finding that some of them were in fact held primarily for sale. The volume of previous sales of leased machines as an accepted part of the taxpayer's regular business together with growing competition made it predictable and indeed inevitable that substantial numbers of the machines out on lease would be sold. While the particular leased machines which would be sold could not be

identified at any particular time before sale, it may fairly be said after their sale that they had been held by the taxpayer primarily for sale. We do not consider that such an ex post facto approach would be valid generally as, for example, in automobile and truck rental cases in which the sales of the rental equipment occurred as "the natural conclusion of a vehicle rental business cycle." Philber Equipment Corp. v. Commissioner, 3 Cir. 1956, 237 F.2d 129, 132, Hillard v. Commissioner, 5 Cir. 1960, 281 F.2d 279. But in our view it is appropriate in situations like the instant case where market forces induce the taxpayer to sell as well as rent its equipment long before it becomes obsolete in order to maintain its competitive position. See Bernstein, "Primarily for Sale": A Semantic Snare, 20 Stan.L. Rev. 1093, 1115–1116 (1968).

■ Finally, we rely upon the reasoning in the *Recordak* case, *supra*, at 463 of 325 F.2d as follows:

> Nor can plaintiff succeed by hitching its wagon to the word "primarily." Whatever the precise scope of that troublesome term in other contexts, it does not exclude from ordinary income the proceeds of sales by one, like plaintiff, who conducts a dual enterprise involving both rentals and sales of the same type of goods. In that setting, "primarily" invokes a contrast, not between selling and renting, but between selling in the ordinary course of business and selling outside of that normal course. Accordingly, if the entrepreneur holds out his wares either for sale or for rental, the taxation of his business gain from sales does not depend upon a comparison of sales to rentals in the particular year. . . . Regardless of that ratio, the goods are held "primarily for sale to customers in the ordinary course of . . . trade or business" because they are regularly offered for sale to customers as part of the normal operation of the enterprise. No case of this kind has allowed capital gains treatment.

Paraphrasing the quoted language, it seems to us that in this setting "primarily" invokes a contrast not between selling and leasing, but between selling and investing, whether the investment be in plant equipment or in the trading markets. The only reason that plaintiff normally leased its machines instead of sold them was that leasing was the more profitable method of disposition; plaintiff has not shown that its leasing business was investment-oriented or that its leased machines were converted involuntarily. Plaintiff has not suggested, and we do not think there is, any policy reason that would justify granting preferential tax treatment on the distinction that plaintiff normally leased, rather than sold, its shoe machines. Indeed, we believe that to grant such relief in the circumstances of this case would create a loophole in the capital gains provisions finding no support in legislative history.

Accordingly, judgment will be entered for the defendant.