EDWARDS INDUSTRIES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Edwards Industries, Inc. v. Commissioner
Docket Nos. 2380-71, 8964-72
United States Tax Court
T.C. Memo 1974-120; 1974 Tax Ct. Memo LEXIS 199; 33 T.C.M. (CCH) 569; T.C.M. (RIA) 74120; May 9, 1974, Filed. *199 Petitioner is an integrated builder of mass housing for sale to the public. After its plans for the development of shopping centers on two pieces of raw real estate, adjoining two of its housing developments, were not consummated, it sold the properties. Petitioner sold a portion of a third piece of real estate to a newly formed corporation, 58 percent of which was owned by petitioner, which in the same agreement contracted with petitioner to provide the necessary construction for use of the property as a mobile home park. Later, under a similar arrangement of sale and construction, petitioner sold the remaining portion of this tract to that same corporation. Held: The two tracts of real estate intended to be developed as shopping centers by petitioner were capital assets and the third tract was property held for sale in the ordinary course of the petitioner's trade or business, giving rise respectively to capital gain and ordinary income on their sales. Held further: All but a portion, identified by the circled number 192, of one of the aforementioned tracts intended to be developed as a shopping center was property held for more than six months. William H. Kinsey, for the petitioner. *200 Leo A. Reinikka, Jr., for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: The respondent determined the following deficiencies in petitioner's federal income tax for the following fiscal years ended March 31: Docket No.
Year
Deficiency 2380-71
1966
$19,863.00
1967
4,515.00
8964-72
1969
4,839.89
The principal issue is whether the three tracts of real estate owned by petitioner were held "primarily for sale to customers in the ordinary course of his trade or business" within the meaning of section 1221, I.R.C. 1954, [1] with the result that gain upon sale thereof is treated as ordinary income rather than capital gain. If such gain is determined to be capital gain, the issue then presented with respect to one of the tracts is whether such gain is derived from an asset "held for more than 6 months" within the meaning of section 1222 so as to be long-term rather than short-term in nature. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Edwards Industries, *201 Inc., is a corporation organized under the laws of the State of Oregon with its principal office in Washington County, Oregon. Petitioner filed its federal corporate income tax return for its fiscal year ended March 31, 1966 with the district director of internal revenue at Portland, Oregon. Such returns for its fiscal years ended March 31, 1967 and March 31, 1969 were filed with the western service center at Ogden, Utah. Petitioner is an integrated builder of medium-priced mass housing for sale to the public. The houses it constructs generally are sold through Edwards Realty Co., a wholly-owned subsidiary of petitioner which also sells houses constructed and owned by others.Petitioner also manufacturers building components and millwork and distributes and sells building materials and supplies, and structural, plate and automobile glass. In addition, during the years in issue, petitioner, either directly or through its subsidiary corporation, constructed, owned and operated convalescent care centers and rental property. The convalescent care centers were sold at the end of the petitioner's 1972 fiscal year. The principal business activities of petitioner during the taxable years *202 involved herein as reported on its returns consisted of the following: subdivision, developing and operative building, with its principal product being houses for sale to the public. Subsequent to 1966 petitioner advertised some commercial property for sale.Petitioner has never operated or constructed a shopping center. The petitioner's sales policy with respect to its residential lots is to charge 20 percent gross over developed costs. Terra Linda #6 Tract Terra Linda #6 is a tract of land containing approximately 11.991 acres adjacent to other tracts referred to as #1 through #5 of Terra Linda. Terra Linda #6 is located in Washington County, Oregon. On June 19, 1961, Herman Jenne, William A. Jenne, Verna A. Peterson and other members of the Jenne family entered into an option agreement with Howard C. Gammon and his wife with respect to property known and referred to as Terra Linda #1 through #6. The homesites of Herman Jenne and William A. Jenne, although a part of the Terra Linda tract, were excluded from this option. The June 19, 1961 option agreement provided that the Terra Linda property would be divided into six parcels and that the options to purchase each parcel were *203 to be exercised by certain dates. The option agreement also provided that, as needed, the deeds to the Terra Linda property would be placed in escrow and the escrow agent would release and record the deed when payment was received by the escrow agent for the tract covered by the deed. The actual times of such transfers of the deeds and the option deadlines are reflected in the following schedule: Terra Linda Trust
Date Deed Executed (Escrow)
Date Deed Recorded
Option Payment Deadline Date 1
9/22/61
10/4/61
11/29/61
2
4/20/62
8/2/62
11/29/62
3
7/15/63
7/15/63
11/29/63
4
11/18/63
8/27/64
11/29/64
5
11/18/63
11/1/65
11/29/65
6
11/18/63
3/31/66
11/29/66
Under the option agreement, the Gammons agreed to give the escrow agent 90 days notice of their intention to exercise an option and purchase a parcel. Only after giving the required notice did the Gammons or their successors or assigns have the right to enter upon the parcel covered by such notice for purposes of planning and developing such property. The Gammons also agreed to pay all taxes on the Terra Linda property from the date of the option agreement. Under the provisions of the option agreement, the Gammons or their successors in interest had the right *204 to refuse to exercise the option on any parcel and thereby terminate the agreement. Shortly after the execution of the June 19, 1961 option agreement, the Gammons assigned all of their interest therein to the Woodfold Corporation (hereinafter Woodfold), a wholly-owned corporation of the Gammons. On September 21, 1961, Woodfold and petitioner entered into an agreement covering the Terra Linda property. In the agreement Woodfold sold Terra Linda #1 to petitioner and granted petitioner an exclusive option to purchase all of Terra Linda #2 through #5 and an undivided one-half interest in Terra Linda #6. This agreement also provided that Woodfold would make the offsite improvements to the parcels purchased by petitioner necessary for their development as subdivided lots. On May 1, 1964, Woodfold sold petitioner all of the former's right, title and interest in and to the June 19, 1961 option agreement for $78,000. At the time of this agreement, petitioner had purchased Terra Linda #1 and #2 and was legally obligated to purchase Terra Linda #3, and consequently Woodfold transferred its rights in the option on Terra Linda #4 through #6 to petitioner. Woodfold's obligation to complete *205 the improvement and development work on Terra Linda #4 through #6 was terminated. Woodfold placed the deeds to Terra Linda #4 through #6 with the same escrow agent who held the deeds executed by the Jenne family as grantors naming Woodfold as grantee. Upon receipt of payment in the amount due the Jenne family under the June 19, 1961 agreement for each of Terra Linda #4 through #6, the escrow agent disbursed the same to the Jenne family and recorded the deed from the Jenne family to Woodfold. On the same date as the escrow agent recorded each such deed from the Jenne family, the escrow agent recorded the corresponding deed for the parcel from Woodfold to petitioner. The following is the schedule concerning the deeds executed by Woodfold as grantor after the May 1, 1964 agreement naming petitioner as grantee: Terra Linda Tract
Date Deed Executed (Escrow)
Date Deed Recorded 4
5/7/64
8/27/64
5
5/7/64
11/1/65
6
5/7/64
3/31/66
The May 1, 1964 agreement also provided that petitioner purchase from Woodfold a portion of Terra Linda #6 referred to as the William A. Jenne homesite for $17,500 and another portion of Terra Linda #6 referred to as the Herman Jenne homesite then owned by the Herman Jenne *206 estate. The deeds to both homesites were recorded in petitioner's name on May 11, 1964. At the time the Herman Jenne homesite was conveyed by the executrices of Herman Jenne's estate to Woodfold on May 1, 1964, Verna A. Peterson, a member of the Jenne family, a party to the June 19, 1961 option agreement and an executrix of the Herman Jenne estate, did not know of any agreement or understanding between Woodfold or Howard C. Gammon and the deceased Herman Jenne whereby the latter had agreed to sell his homesite in return for a commitment by the former to purchase Terra Linda #6. She was aware that Herman Jenne had given Woodfold a right of first refusal on his homesite. Any such commitment on Woodfold's part, which both Gammon and petitioner believed to exist and to be binding, was not tantamount to the exercise of the option. Petitioner and the Jenne family agreed in March, 1966, that the acreage of Terra Linda #6 was 11.991 acres for purposes of determining the purchase price due the Jenne family at $3,200 per acre. Payment therefor was made on March 31, 1966. Prior to March, 1966, petitioner used Terra Linda #6 as a dump for excess dirt from excavations in the development of *207 the other parcels of the Terra Linda property. Petitioner also used a real estate office located on Terra Linda #6. The aforementioned September 21, 1961 agreement between Woodfold and petitioner granting petitioner an option to acquire an undivided one-half interest in Terra Linda #6 stated that Terra Linda #6 had potential for commercial development and that the parties would jointly develop, own and operate any commercial improvements thereon. Petitioner's intentions at the outset with regard to Terra Linda #6 were to develop a shopping center and these intentions remained the same after it acquired a 100 percent interest in said tract through the May 1, 1964 agreement.
In its endeavor to develop Terra Linda #6 into a shopping center, petitioner tried to interest several national retail firms in the site in order to get financing for the shopping center. However, petitioner was unsuccessful in its attempts to attract a national firm, and having done no work towards development on the real estate itself, it abandoned its plan for the shopping center development. After an unsolicited contact by Portland Fixtures Co., (hereinafter Portland) and never having advertised the property *208 for sale, petitioner agreed to sell Terra Linda #6 to that corporation by agreement dated May 19, 1965. The agreement provided that Portland would not be entitled to possession of any portion of Terra Linda #6 until that portion had been conveyed to it by deed. Real property taxes, rents and interest were to be prorated between petitioner and Portland as of the date Portland took possession of each portion. The agreement also recognized that, except for the two Jenne homesites which it then owned, petitioner at that time had only an option to purchase Terra Linda #6. The agreement further provided that the deeds to the two homesites and the June 19, 1961 option agreement would be placed with an escrow agent who would release the deeds for Terra Linda #6 to Portland as payments therefor were received and who would exercise the June 19, 1961 option in case of the failure of petitioner to do so. All of the deeds relating to Terra Linda #6, except for one portion thereof, were recorded in Portland's name after March 31, 1966, the earliest such date of recordation being September 29, 1967. The deed to one portion of the Terra Linda #6 tract (covering an area identified by the circled *209 number 192) was recorded in Portland's name on March 31, 1966. The land sales contract with Portland called for a selling price of $195,000, and petitioner reported that amount, less its $113,669 basis on its fiscal 1966 federal corporate income tax return as a long-term capital gain, some $81,331. The date the property was acquired and the date sold as reported in said return was 1962 and April, 1965, respectively. Respondent, in his notice of deficiency, determined that such gain did not qualify as long-term capital gain, first because it was not derived from property held more than 6 months and secondly because it was derived from the operation of a trade or business. Allenwood Tract The Allenwood property, consisting of approximately 27 acres, was acquired by petitioner on November 15, 1963 under a land sales agreement of the same date. Petitioner, in the regular course of its business, plotted and subdivided the major portion of the Allenwood property into 54 lots, built residences thereon, and sold the residences and the lots to the public. A portion of the Allenwood property was adaptable for commercial development and, upon application by petitioner, the zoning of this *210 portion was changed on June 27, 1964 from single dwelling residential to commercial limited to neighborhood needs. Petitioner's purpose in obtaining this change of zoning was to develop a small shopping center. After deciding that it was not well enough established in the field to attract retail firms, petitioner abandoned its intention of developing the shopping center. During its taxable year ended March 31, 1967, petitioner, having been approached by one of the to-be purchasers, sold the portion of the Allenwood property which had been zoned commercial. The sales were made to two different purchasers during April, 1966. The aggregate selling price was allocated basis of $15,311. This gain on the two sales was reported by petitioner on its federal corporate income tax return for its fiscal year ended March 31, 1967 as long-term capital gain. In his notice of deficiency respondent determined that such gain was ordinary income arising from the operation of a trade or business. Denny Road Tract The Denny Road property is a tract of land acquired by petitioner in May, 1963. The property was zoned for light industrial and multiple dwelling units. Petitioner obtained modification *211 of such zoning as was necessary to permit construction and operation of a mobile home park. V. Everett Hollister (hereinafter Hollister), having learned of the change in zoning, contacted petitioner concerning the possibility of acquiring the Denny Road property for the purpose of development into a mobile home park. Following negotiations between Hollister and the responsible officers of petitioner, a corporation known as Hidden Village Mobile Park, Inc. (hereinafter Hidden Village) was organized on August 26, 1964. Petitioner purchased 35 shares of common stock of Hidden Village for $35,000 and Hollister and his wife purchased 25 shares thereof for $25,000. Petitioner decided to associate itself with Hollister in developing a mobile home park because it had no expertise in the area while it felt Hollister did. Hollister advised and aided petitioner in the planning and construction of the park and becamse its manager. Under an agreement dated January 8, 1965, petitioner agreed to sell approximately one-half of the Denny Road property to Hidden Village for $6,000 per acre and to construct thereon a mobile home park on a cost plus 10 percent basis. On or shortly before March 31, *212 1966, petitioner completed construction in accordance with the January 8, 1965 agreement and became entitled to payment for such construction and for the land. The amount payable for the land was $30,120 which, after subtracting its $18,200 basis, produced a gain of $11,920. The construction profit was $12,157, 10 percent of the construction cost of $121,569.85. On its federal corporate income tax return for its fiscal year ended March 31, 1969, petitioner reported the gain on the sale of one-half the Denny Road tract as long-term capital gain and the construction profit thereon as ordinary income. During its fiscal year ended March 31, 1969, petitioner constructed a mobile home park development on the remaining portion of the Denny Road property under a similar contractual arrangement as with the first half and transferred that remaining portion and the mobile home park improvements thereon to Hidden Village. On its federal corporate income tax return for its 1969 fiscal year, petitioner reported a $19,130 gain on the sale of the remaining portion of the Denny Road tract as long-term capital gain and the construction profit thereon as ordinary income. The sales price of the *213 land was $41,487 and its basis $22,356. [2] In his notices of deficiency, respondent determined that the gains on each portion of the Denny Road tract were ordinary income arising from the operation of a trade or business. OPINION Terra Linda #6 Tract The principal issue involving the Terra Linda #6 tract is whether that real property owned by petitioner was held "primarily for sale to customers in the ordinary course of his trade or business" within the meaning of section 1221(1), [3] *214 with the result that gain upon its sale is to be treated as ordinary income rather than capital gain. If such gain is determined to be capital gain the issue then presented is whether such gain is derived from property "held for more than 6 months" within the meaning of section 1222(3) [4] so as to be long-term rather than short-term. [5] Restating the facts as briefly as possible, the Gammons received an option on the entire Terra Linda tract in 1961 and in that same year transferred their rights in the option to their wholly-owned corporation Woodfold. Petitioner and Woodfold then, still in 1961, *215 entered into a contract whereby Woodfold sold Terra Linda #1 to petitioner and granted it an exclusive option to purchase all of Terra Linda #2 through #5 and an undivided one-half interest in Terra Linda #6. In 1964, Woodfold sold petitioner its remaining one-half interest in its option on Terra Linda #6. Petitioner intended to develop a shopping center on Terra Linda #6 and to use Terra Linda #1 through #5 for residential housing, which it actually did. However having been unsuccessful in its attempt to attract national retail firms, it abandoned its intentions with respect to Terra Linda #6 and entered into a land sales contract for that property with Portland on May 19, 1965. On March 31, 1966, petitioner paid the purchase price for Terra Linda #6 under the aforementioned option agreement and received the property. Then, after receiving payment from Portland on a portion of Terra Linda #6, the petitioner transferred title and possession of that portion to Portland, all transfers except one occuring more than 6 months after March 31, 1966.
The question whether property at the time of sale constitutes a capital asset held by the taxpayer as an investment or property held primarily *216 for sale to customers in the ordinary course of his trade or business presents a pure question of fact to be determined after consideration of all the surrounding circumstances in each case. Kelley v. Commissioner, 281 F.2d 527, 528 (C.A. 9, 1960), affirming a Memorandum Opinion of this Court; William B. Howell, 57 T.C. 546, 554 (1972); W. T. Thrift, Sr., 15 T.C. 366, 369 (1950). But see United States v. Winthrop, 417 F.2d 905, 910 (C.A. 5, 1969). A number of factors have been considered in resolution of this issue, see William B. Howell, supra at 554 and Maddux Construction Co., 54 T.C. 1278, 1284 (1970); however, no single factor standing alone is determinative. W. T. Thrift, Sr., supra at 369. The burden of proof herein is on the petitioner, S. O. Bynum, 46 T.C. 295, 298 (1966), and in addition we are aware that the capital gains provisions, which are an exception to the normal tax rates, are to be construed narrowly. Corn Products Co. v. Commissioner, 350 U.S. 46, 52 (1955). In support of his position that Terra Linda #6 is property held for sale to customers in the ordinary course of petitioner's trade or business, respondent contends that petitioner was engaged in all phases *217 of real estate development and sales, including commercial property, and that the shopping center on Terra Linda #6 was to be developed in conjunction with and as an allurement for its residential housing development of Terra Linda #1 through #5. Petitioner, on the other hand, contends that at the time of sale the parcel in question was not held for sale to customers in the ordinary course of its business. We agree with petitioner. It is well established, as the respondent admits, that a taxpayer engaged in the real estate business may also hold real property as an investment. Randolph D. Rouse, 39 T.C. 70 (1962); Eline Realty Co., 35 T.C. 1 (1960). In the isntant case, as with the taxpayer in Maddux Construction Co., supra, petitioner was not, as the respondent asserts, in the general real estate business at the time of sale of the property in question. Rather it was concerned principally with one facet thereof, namely the construction and development of residential housing and lots. Thus we find Margolis v. Commissioner, 337 F.2d 1001 (C.A. 9, 1964), reversing in part and affirming in part a Memorandum Opinion of this Court, as relied upon by respondent, to be distinguishable *218 on its facts. Actually the portion of Margolis v. Commissioner, involving commercial property supports our conclusion. After carefully reviewing the entire record in light of the various factors relevant to the question at hand, we are of the opinion that at the time of sale the Terra Linda #6 tract was not held by petitioner for sale to customers in the ordinary course of its trade or business. In support of this conclusion we note that petitioner had never constructed or operated a shopping center and its sales of raw land with commercial potential were minimal or nonexistent prior to the year in question. Terra Linda #6 was not advertised for sale and the petitioner was approached with respect to the purchase of the real estate. Furthermore, the few improvements, such as the sales office building, appear to be of insignificant value. Petitioner intended to develop a shopping center on the tract in question but was unsuccessful in its attempt to do so. Petitioner then decided to sell the tract after realizing its plans for a shopping center development were futile. While we do not know whether petitioner intended to operate the shopping center itself or to sell it, we think *219 such intent is inconclusive in the instant case since the original purpose for which property is held is subject to change and here actually did change. Where there is such a changed purpose, the determining factor is the purpose for which the property is held at the time of sale. Mauldin v. Commissioner, 195 F.2d 714, 717 (C.A. 10, 1952), affg. 16 T.C. 698 (1951); Eline Realty Co., supra at 5. At the time of sale we think the petitioner's purpose in holding the property was for investment. Consequently we need not consider the respondent's argument that the development of Terra Linda #6 as a shopping center was part of its ordinary business of developing Terra Linda #1 through #5 as residential housing becuase, even assuming that was petitioner's original intent, his purpose for holding the property clearly changed. The second issue involving the Terra Linda #6 tract requires our determination of the length of the period said tract was held by petitioner. The respondent contends that the property was held for not more than 6 months while petitioner asserts, under several theories, that it was held for more than 6 months thus entitling it to long-term capital gains treatment under *220 the provisions of section 1222. The burden of proof herein is on the petitioner. James S. Reily, 53 T.C. 8, 13 (1969). In McFeely v. Commissioner, 296 U.S. 102, 107 (1935), the Supreme Court explained that the word "held", as used in section 101(c) (8) of the Revenue Act of 1928, defining capital assets as property held by the taxpayer for more than 2 years, was to be equated with "owned". In common understanding, to hold property is to own it. In order to own or hold one must acquire. The date of acquisition is, then, that from which to compute the duration of ownership or the length of holding. * * * (296 U.S. at 107) In resolving the question of when a sale is consummated for tax purposes, we must look to the date on which the parties intend the benefits and burdens or the incidents of ownership of the property to pass to the purchaser. Ted F. Merrill, 40 T.C. 66, 74 (1963), affirmed per curiam 336 F.2d 771 (C.A. 9, 1964).[6] See Lucas v. North Texas Lumber Co., 281 U.S. 11 (1930). The technical refinements in the passage of legal title alone do not determine when a taxpayer's holding period with respect to real property ends, Ted F. Merrill, supra at 77, at least where title *221 is transferred after the benefits and burdens. Since the property involved herein is situated in Oregon the law of that state is controlling in construing the time at which the benefits and burdens of the property are transferred under the particular contract provisions of the instant case. Vernon Hoven, 56 T.C. 50, 55 (1971). It is well established that the period during which an option is held is not to be included in the holding period of the property acquired by exercise of the option. Joseph P. Pike, 44 T.C. 787, 797 (1965).In the instant case the option on Terra Linda #6 (excluding the two Jenne homesites) was exercised on or shortly before March 31, 1966. On that date payment for the property was made and the title thereto was delivered to and recorded in the name of the petitioner. After an examination of all the facts we conclude that the Terra Linda #6 tract (exclusive of the two Jenne homesites) was acquired by petitioner no earlier than March *222 31, 1966. We do not think that the delivery of title to the property to the escrow agent by the Jenne family on November 18, 1963 or by Woodfold on May 7, 1964 is at all indicative here of intent of the parties to transfer then the benefits and burdens of the property. Nor do we believe that petitioner's minimal use of Terra Linda #6 as a dumping ground for dirt or use of a sales office building thereon constitutes legal possession of the property. The original option agreement between the Jenne family and the Gammons, from which the petitioner derived its rights, stated that the purchaser would be entitled to enter upon the property only after a 90-day notice of intent to exercise the option was given to the escrow agent. Petitioner has not shown when or if this requisite notice was given. Petitioner contends that it acquired the property in question on May 1, 1964 by virtue of the agreement made on that date with Woodfold. However it is clear that at that point all Woodfold had was an option on Terra Linda #6 and thus that is all it could transfer to petitioner. The petitioner then asserts that it was committed to exercise the option at that time becuase of Gammon's statement *223 to that effect when negotiating with Herman Jenne for his homesite. Apparently petitioner contends that Gammon made a verbal agreement with Jenne to exercise the option or perhaps a verbal modification of the option, since Gammon admitted at the hearing that any statements made by him were not tantamount to an exercise of the option itself. Verna Peterson was a party to the original option grant of June 19, 1961 by the Jenne family and she was co-executrix of Herman Jenne's estate. As the former she clearly had an interest in the exercise of the option and should have known of any modification of the option claimed by the petitioner. When she sold Herman Jenne's homesite to petitioner in her latter capacity, petitioner said nothing about any agreement with Herman Jenne to purchase Terra Linda #6 as a condition to its purchasing the homesite. We think any such verbal statements were in the nature of moral commitments rather than legal obligations. Cf. Ore. Rev. Stat. section 93.020 (1963). We turn next to the question of when the petitioner's holding period for Terra Linda #6 ended. After considering the intent of the parties as to when the incidents of ownership of the property *224 were to be transferred, we are of the opinion that, except for the parcel identified by the circled number 192, the holding period for all portions of Terra Linda #6 extended more than 6 months after March 31, 1966. Petitioner and lots. entered into a land sale contract on May 19, 1965 and petitioner placed the option and the deeds to the portions of Terra Linda #6 it then owned with an escrow agent. In Ted F. Merrill, supra at 74, we stated: * * * Ownership of property is not a single indivisible concept but a collection or bundle of rights with respect to the property. Normally, ownership of real estate would be considered transferred on the date of delivery of the deed. But where delivery of the deed is delayed to secure payment of the purchase price or for some other reason such as the escrow arrangment here involved, we believe the intent of the parties as to when the benefits and burdens of ownership of the property are to be transferred, as evidenced by factors other than passage of bare legal title, must control for purposes of this statute. See also Albert E. Dyke, 6 T.C. 1134, 1139 (1946). We think it clear that the parties did not intend for the benefits and burdens of *225 ownership of each portion of Terra Linda #6 to pass to the purchaser until payment for that portion was made. At that time, and not until, the purchaser would be entitled to a deed to and possession of the particular portion. Taxes on and income from each portion were to be prorated between vendor and purchaser at that time. As of that date, when legal title and possession were transferred, the purchaser bore the risk of loss from physical damage to the property, but prior to the transfer of either legal title or possession the vendor bore this risk of loss according to Oregon law in force at the time of sale. See Ore. Rev. Stat. section 93.290 (1963). Since title and possession to all portions of Terra Linda #6, except that identified by the circled number 192, were transferred on or after September 29, 1967, this being more than 6 months after March 31, 1966, we conclude that Terra Linda #6, except for the aforementioned portion, was held by petitioner for more than 6 months within the intendment of section 1222(3). Allenwood Tract The sole issue concerning the Allenwood tract presents the question whether that tract was held by petitioner for sale to customers in the ordinary *226 course of its trade or business. The facts, although less complicated, are substantially the same as those involving the Terra Linda #6 tract. Again petitioner purchased land and developed residential housing on a major portion of the property. It also intended to develop a small shopping center on a portion of the land. After its plans for development of the shopping center were frustrated, petitioner sold the remaining portion of the Allenwood tract. We think the facts concerning the Allenwood tract require the same reasoning and conclusion as we reached with regard to the Terra Linda #6 tract. Thus we conclude that the Allenwood tract was not held for sale to customers in the ordinary course of petitioner's trade or business. Petitioner is consequently entitled to capital gain treatment on sale of the Allenwood tract. Denny Road Tract Again we are presented with the question whether petitioner held certain real property for sale to customers in the ordinary course of its trade or business. Petitioner purchased the Denny Road property in May, 1963 and in January, 1965 it agreed to construct the improvements necessary for use as a mobile home park on one-half the property and *227 to sell that half to a partially-owned subsidiary which it and one Hollister formed to operate the park. On or before March 31, 1966, petitioner completed construction and transferred the property to the subsidiary Hidden Village. During its fiscal year ended March 31, 1969, petitioner transferred the remaining one-half of the property to Hidden Village under a contractual arrangement similar to that employed for the first half. While it reported its construction profit on each transfer to Hidden Village as ordinary income, petitioner reported the gain on the sale of the property itself as capital gain since it believed then, and now so contends, that the Denny Road property was held for investment. It would serve no useful purpose to restate all the factors considered in the many cases in this area. Suffice it to say that we have considered the entire record in light of these factors. While there are certain factors here that might support the position of each party, it is our conclusion on the balance of all the evidence that the Denny Road property was held for sale to customers in the ordinary course of petitioner's trade or business. The fact that we consider most important *228 in the instant case is that petitioner was in the business of purchasing real estate, making improvements thereon for use as residential lots and constructing residential houses thereon. While petitioner obviously did not construct the mobile homes for use in Hidden Village's park, we think its substantial construction for the mobile home park was sufficiently akin to its ordinary course of business in the development of lots to taint its two transactions with Hidden Village. Demonstrating the substantiality of the improvements is the fact that basic cost to petitioner and the selling price of the first half of the Denny Road tract were $18,200 and $30,120, respectively, while the cost of the improvements to that half was over $133,000. While the specifics of the improvements were not introduced into evidence we can only assume that they included the construction of roads and the extension of utilities to each mobile home site. Such improvements would clearly be the same as those necessary for development of residential lost. [7] We do not think the absence of promotion or advertising authorized by petitioner is significant in the instant case. Accordingly, we conclude that each *229 of the sales of one-half the Denny Road tract was of property held for sale to customers in the ordinary course of petitioner's trade or business. Decision will be entered under Rule 155 in Docket No. 2380-71. Decision will be entered for the respondent in Docket No. 8964-72. Footnotes
1. All Code references are to the Internal Revenue Code of 1954 as amended. ↩
2. We note that the Stipulation of Facts and petitioner's tax return state the gain to be $19,130 whereas it appears to us to be $19,131. ↩
3. SEC. 1221. Capital Asset Defined. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * *. 4. SEC. 1222. Other Terms Relating to Capital Gains and Losses. For purposes of this subtitle - (1) Short-term capital gain. - The term "short-term capital gain" means gain from the sale or exchange of a capital asset held for not more than 6 months, if and to the extent such gain is taken into account in computing gross income. * * * (3) Long-term capital gain. - The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income. ↩
5. The respondent has apparently conceded that the two Jenne homesites were held for more than 6 months. ↩
6. We realize that the cited case involved the holding period required by sec. 1231. However, since that section employs the same phrase "held for more than 6 months" used in sec. 1222(3), the cited case is fully applicable here. ↩
7. We deem it irrelevant whether petitioner conveyed the first half of the property to Hidden Village before or after making the improvements thereon since the obligations to sell and improve were both contained in the document of January 8, 1965. While still irrelevant, apparently there is no doubt that the improvements were made to the second half of the Denny Road tract prior to its conveyance to Hidden Village. ↩